FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ JAN 14 2013 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MELISSA PRESSLEY,

Plaintiff,

-against-

THE CITY OF NEW YORK; MICHAEL CARDOZO; GEORGIA PESTANA; KENNETH MAJERUS; STUART SMITH, MURIEL GOODE-TRUFANT; FAY LEOUSSIS; MARCK PALOMINO; JUDITH DAVIDOW; MARC ANDES; ELIZABETH GALLAY; INGA VAN EYSDEN; ERIC RUNDBAKEN; RITA D. DUMAIN; GAIL RUBIM, GABRIEL TAUSSIG; and FOSTER MILLS,

Defendants.

**MEMORANDUM & ORDER**

11-CV-3234 (SLT) (RER)

**TOWNES, United States District Judge:**

On June 29, 2011, Plaintiff Melissa Pressley, an attorney and former corporation counsel acting pro se, filed this action alleging employment discrimination and retaliation against the City of New York (the "City"), and sixteen individual city employees, (collectively, "Defendants"). Plaintiff asserts violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.; violations of her constitutional rights under the First, Fourth, and Fourteenth Amendments, pursuant to 42 U.S.C. §§ 1983, 1985(1)-(3); and unspecified state law claims. Defendants now move for partial dismissal of the second amended complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. BACKGROUND

### A. Facts

The following facts are drawn from Plaintiff's second amended complaint (Docket No. 21 ("SAC")) and are assumed to be true solely for purposes of this decision.

On March 1, 2004, Plaintiff, an African-American woman, began her legal career as the only non-white attorney within the Torts Division Special Litigation Unit ("SLU") at the Office of Corporation Counsel of the City of New York. (SAC ¶¶ 2, 6, 7). SLU "litigated the City's high media-exposure, high-damages, and catastrophic personal injury cases" and "represented the City in both state and federal court, managed complex litigation . . . and litigated admiralty law and toxic tort actions." (SAC ¶¶ 11, 13). Plaintiff performed her duties competently, "achiev[ing] noteworthy results" in these legal areas, but was constructively terminated by the City in November 2007. (SAC ¶¶ 7, 8, 14). During her tenure at SLU, Plaintiff experienced unequal and unfair treatment in training, career development, advancement opportunities, compensation, and working conditions because of her race and for complaining of the treatment she and other racial minorities experienced. (SAC ¶ 15). SLU Chief Mark Palomino was Plaintiff's supervisor and caused Plaintiff to suffer this type of unequal treatment by "unfairly favoring white attorneys" in these areas, by his own conduct toward Plaintiff, and by "permitting mistreatment . . . by supervisory staff." (SAC ¶ 16).

Two black female attorneys, "Karlyne and Suzanne," were assigned to SLU before Plaintiff arrived, "but left because of unfavorable experiences" similar to those of Plaintiff and were reassigned to other units without raises or promotions. (SAC ¶¶ 17, 18). At some point after Plaintiff began work at SLU, two other black female attorneys, "Natasha and Judith," were also reassigned to other Torts Division units without raises or promotions, having experienced

similar unfair working conditions. (SAC ¶ 19). Only white attorneys received promotions and pay raises when they transferred to other units. (SAC ¶ 20). Torts Division Chief Fay Leoussis encouraged these conditions to continue by "ignoring, discrediting, or invalidating" concerns brought by Plaintiff and other black attorneys at SLU and by openly siding with those who acted wrongfully. (SAC ¶ 22). The City "denied Plaintiff an equal opportunity to transfer to corporate legal divisions," which harmed her professional development. (SAC ¶ 23). Instead, City officials sought to have Plaintiff transfer to other units with a greater share of black attorneys or in areas of law involving "street offenses . . . [,] deliberately block[ing] opportunities in coveted areas of corporate law." (SAC ¶ 24). The City generally took this approach to racial minorities, recruiting them to boost diversity statistics, but then keeping the prestigious corporate units "overwhelmingly, if not exclusively, assigned to white attorneys." (SAC ¶ 29). During Plaintiff's tenure at SLU, there were "no racial minority supervisors or senior counsel." (SAC ¶ 30). Despite Plaintiff's success in her position, she was repeatedly told that she was not ready for SLU and it had been a mistake to assign her there. (SAC ¶ 25). Palomino attempted within the first three months of Plaintiff's arrival at SLU to transfer her to the Brooklyn or Bronx unit, which "contained the greatest concentration of black attorneys." (SAC ¶¶ 26, 27). As a result of these unfair practices, Plaintiff operated under greater pressure "to be perfect" compared to white attorneys. (SAC ¶ 28).

To discourage black employees from complaining of racist treatment, the City "instilled the fear of retaliation." (SAC ¶ 32). The City "proudly displayed" its retaliatory conduct victories over complainants to "discourage these complaints or expressions of opinions." (SAC ¶ 33).

From December 2004 until her departure in November 2007, Plaintiff communicated with head Equal Employment Opportunity Commission ("EEOC") officer Muriel Goode-Trufant, who conducted the investigation of Plaintiff's complaint. (SAC ¶ 34). It was a pattern or practice that when a black attorney met with an EEOC officer to complain, her career as a City employee would be "harmed or destroyed." (SAC ¶ 35).

In September 2004, Plaintiff refused the demands of her immediate supervisor, Judith Davidow, to report to work on her Sabbath, a Sunday. (SAC ¶ 36). Nevertheless, Plaintiff completed her assignment timely and successfully. (SAC ¶ 38). A couple of days after this incident, Davidow for the first time criticized Plaintiff's work arrival times. (SAC ¶ 39). In Plaintiff's 2004 evaluation, Davidow and Palomino "included unfair, untrue comments or ratings, and criticism that implicated" the Sunday incident. (SAC ¶ 40). Meanwhile, Leoussis attempted to convince Plaintiff that she was not a good attorney, promoted untrue criticisms about her, and invalidated her concerns. (SAC ¶ 42). As Plaintiff's work conditions deteriorated, she spoke more with Goode-Trufant. (SAC ¶ 43). Her managers and supervisors promoted negative racial stereotypes to aid in the unlawful discrimination, "portraying Plaintiff as angry, irresponsible, and as someone who could not get along with anyone." (SAC ¶ 44). Her repeated requests for transfer from February 2005 through August 2007 were denied. (SAC ¶ 45). For example, despite her qualifications in the area, the City refused to transfer Plaintiff to the Pensions Division, while it encouraged such transfers for other attorneys who were "white and Jewish." (SAC ¶ 47). Foster Mills, the managing attorney responsible for administrating the annual department-wide transfer program, "violated established procedure in denying Plaintiff's transfers" and "deliberately used his position to interfere with . . . [her] rights or benefits . . . in a concerted effort to end [her] career at the City." (SAC ¶ 50).

In October 2007, Plaintiff was granted and appeared for interviews with the chiefs of five divisions, all of whom are named as defendants, and none offered her a transfer "because of her history and status as an EEO complainant, observance of her Sabbath, and/or her race." (SAC ¶ 51). In particular, Georgia Pestana, Chief of Labor & Employment Law, used terms like "aggressive" and "over confidence" to justify the denial of Plaintiff's transfer request. (SAC ¶ 52).

Stuart Smith, Director of Attorney Recruitment and Retention, discussed with Plaintiff and other black attorneys their struggles and concerns, presenting himself as an ally. (SAC ¶ 54). Smith and Pestana served on the City's Diversity Committee that heard statements regarding unequal treatment in 2005 from several black female attorneys, including Plaintiff. (SAC ¶ 55).

After Plaintiff began communicating with Goode-Trufant in December 2004, her second immediate supervisor, Marc Andes, became verbally abusive toward her, subjecting her to harsher treatment than the white attorneys. (SAC ¶ 57). The City allowed this behavior to persist by ignoring Plaintiff's pleas to Goode-Trufant for help. (SAC ¶ 57). In Spring 2007, Plaintiff filed a formal internal EEOC complaint after another supervisor, Elizabeth Gallay, refused to seek appeal for a novel case litigated by Plaintiff in 2005, despite doing so for a white attorney in a less meritorious case. (SAC ¶¶ 58, 59, 60). In 2007, Gallay also wrongfully "disrupted Plaintiff's efforts to litigate a federal action," though Plaintiff was able to achieve "an exceptional, unprecedented motion victory." (SAC ¶¶ 63, 64).

In September and October 2007, Goode-Trufant told Plaintiff by phone that the investigation had concluded in her favor, that her transfer request would be granted, and that Palomino and Gallay were not to supervise her anymore. (SAC ¶ 66). In an October 2007 letter,

however, Goode-Trufant contradicted her oral statements and instead found "no probable cause" of discrimination, though stating that Palomino and Gallay had committed supervisory failures. (SAC ¶ 67). In November 2007, instead of receiving the positive transfer she was promised orally, Plaintiff was offered the option of remaining under the supervision of Palomino and Gallay or being transferred to a less prestigious borough unit within the Torts Division. (SAC ¶¶ 68, 69). To avoid an adverse EEOC ruling, Defendants allegedly submitted materially false information, including the assertion that Plaintiff had applied for a supervisory position at the Pensions Division, to justify denial of her transfer request. (SAC ¶¶ 93, 94). Denied the resolution she requested in her EEOC complaint, Plaintiff resigned. (SAC ¶ 70).

Corporation Counsel Michael Cardozo received information about Plaintiff's claim directly from Plaintiff herself, Goode-Trufant, and the Diversity Committee, yet "sanctioned, aggravated, or caused the harm of which [she] complains." (SAC ¶ 103). Cardozo made a deliberate decision not to resolve the adverse working conditions, "participating in a scheme to cover up the wrongs" in the department, and refusing to offer a reasonable transfer, which led to Plaintiff's resignation. (SAC ¶ 104).

In December 2007, Plaintiff joined a midtown law firm. (SAC ¶ 81). The City was a major client of the firm, and City officials interfered with Plaintiff's work in retaliation for her EEOC claims by telling the firm "that it did not want Plaintiff to litigate certain City cases." (SAC ¶ 82). These City officials used the economic power of the city to wrongfully cause Plaintiff's termination at the firm after only six months of practice, for which she received no explanation. (SAC ¶ 83). In January 18, 2009, Plaintiff opened her own law office at 100 Church Street, the same address as the City law department. (SAC ¶ 78). Since that time, Cardozo and Kenneth Majerus, who oversees all mail room policies, have been involved in the

deliberate practice of "retaining, opening, and reviewing mail sent to Plaintiff and Plaintiff's business, because of [her] civil rights claims against defendants." (SAC ¶ 77). By this "search-and-seizure mail activity," Cardozo and Majerus "violat[ed] federal mail and wire fraud statues" and wrongfully obtained information used to cause Plaintiff to lose a case assignment defending Con Edison. (SAC ¶¶ 78, 79).

Plaintiff further alleges that the City violated antitrust laws by interfering with the Con Edison assignment and any future Con Edison cases. (SAC ¶¶ 85, 90). The City has a "unique . . . monopoly" over personal injury litigation, which Plaintiff relies upon for her income. (SAC ¶ 86). Plaintiff "has not and will not receive" any cases defending City agencies because of retaliation for her complaints. (SAC ¶ 91).

In January 2008, Plaintiff filed a state court action involving these EEOC claims, which was discontinued without prejudice so that she could pursue them through the EEOC. (SAC ¶ 119). Plaintiff had agreed to settle for a "five-digit figure," but Defendants "refused to raise their offer by even a penny" and terminated negotiations. (SAC ¶¶ 120, 121). Plaintiff asserts that she has standing to argue that the City has paid more in defense costs at taxpayer expense because outside counsel and individual Defendants are "personally motivated" to prolong the litigation. (SAC ¶¶ 121, 123).

**B. Procedural History**

On August 25, 2008, Plaintiff filed a formal charge of "race discrimination and retaliation" with the EEOC. (Docket No. 21 at 30). The EEOC issued its right to sue letter on April 4, 2011. (Docket No. 21 at 27). On June 29, 2011, within the 90 day statute of limitations, Plaintiff commenced this action against the City and its Office of Corporation Counsel, alleging constructive termination, unequal treatment, and retaliation because of her race and religion, in

violation of Title VII and 42 U.S.C. §§ 1981, 1983, and 1985. (Docket No. 1 at 1-2). On October 24, 2011, Plaintiff filed an amended complaint as of right, this time naming the City, Cardozo, and Pestana as defendants. (Docket No. 6 at 1). On December 22, 2011, these defendants filed their answer. (Docket No. 15). Thereafter, on March 2, 2012, Plaintiff filed her second amended complaint, pursuant to Title VII, 42 U.S.C. §§ 1983, 1985(1)-(3), and "any related claims under New York Law,"[1] against the City, Cardozo, Pestana, Majerus, Goode-Trufant, Smith, Leoussis, Palomino, Davidow, Andes, Gallay, Mills, Inga Van Eysden, Eric Rundbaken, Rita D. Dumain, Gail Rubin, and Gabriel Taussig. (SAC at 1). Plaintiff appears to assert seven causes of action: (1) Title VII race discrimination, against the City; (2) Title VII retaliation, against the City; (3) "Continuing Retaliation and Mail Tampering/Theft, Mail and Wire Fraud," against the City, Cardozo, and Majerus; (4) "Continuing Retaliation and Antitrust Laws," against the City; (5) "Interference with the Administration of Justice," against all Defendants; (6) continuing retaliation under §§ 1983 and 1985, against all Defendants; and (7) "Conflict of Interest," against all Defendants.

On July 31, Defendants filed their fully briefed motion for partial dismissal, pursuant to Rules 12(b)(1) and (6). (Docket Nos. 57-63). Defendants argue, inter alia, that the only sustainable claims are those brought under Title VII for discrimination and retaliation against the City, and that all other causes of action either fail to state a claim or are time-barred.

## II. STANDARD OF REVIEW

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a

---

[1] Plaintiff never makes out these claims and the Court does not read them into the second amended complaint.

decision on the merits and, therefore, an exercise of jurisdiction." Magee v. Nassau Cnty. Med. Ctr., 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998) (citing Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990)).

Under Rule 12(b)(1), a court must dismiss a complaint where it lacks subject matter jurisdiction over the action. A plaintiff asserting such jurisdiction "has the burden of proving by a preponderance of the evidence that it exists." Phifer v. City of N.Y., 289 F.3d 49, 55 (2d Cir. 2002). Though a court generally must accept material factual allegations in the complaint as true, a court "does not, however, draw all reasonable inferences in the plaintiff's favor." Sokolowski v. Metro. Transp. Auth., 849 F. Supp. 2d 412, 414 (S.D.N.Y. 2012) (citing J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004)). Where jurisdictional facts are disputed, "a district court may resolve [the dispute] by reference to evidence outside the pleadings, including affidavits." State Emp. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 77 n.4 (2d Cir. 2007).

In contrast, when considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). To withstand a motion to dismiss, a complaint's "factual allegations must be enough to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Id. at 555, 570. As the Supreme Court has noted, this plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

Moreover, because "a Rule 12(b)(6) motion challenges the facts alleged on the face of the complaint . . . or, more accurately, the sufficiency of the statements in the complaint," see Cortec

Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) (internal citations omitted), materials outside the four corners of the complaint are "generally not considered on a motion to dismiss unless the court treats it as one for summary judgment, giving all the parties a reasonable opportunity to present relevant evidence under Rule 56," Nicholls v. Brookdale Univ. Hosp. Med. Ctr., No. 03-CV-6233 (JBW), 2004 WL 1533831, at *2 (E.D.N.Y. July 9, 2004). A court can consider only "documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (citing Cortec, 949 F.2d at 47).

Typically, "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007). In this case, however, Plaintiff is an experienced attorney licensed to practice law in this state. Plaintiff's papers therefore will be held to the higher standard that applies to submissions drafted by lawyers. See Gray v. City of New York, 10-CV-3039 (SLT)(CLP), 2012 WL 947802, at *10 (E.D.N.Y. Mar. 20, 2012); see also Moore v. City of New York, No. 08-CV-2449 (RRM)(LB), 2011 WL 795103, at *1 (E.D.N.Y. Feb. 28, 2011) (even disbarred attorney's submissions not entitled to degree of liberality afforded non-attorney pro se plaintiffs).

## III. DISCUSSION

### A. Subject Matter Jurisdiction: Counts Three, Four, Five, and Seven

#### 1. Count Three: Criminal Allegations

In Count Three of the complaint, Plaintiff alleges that the City, Cardozo, and Majerus engaged in "Mail Tampering/Theft, Mail and Wire Fraud" by opening and reading her mail

while she was in solo practice at 100 Church Street and by using "mail, telephone, or fax" to interfere with her employment at the midtown law firm by communicating that the City did not want her to litigate certain cases. As Defendants correctly note, there is no private right of action for mail fraud under 18 U.S.C. § 1341. (Def. Mem. at 6); see Pharr v. Evergreen Garden, Inc., 123 Fed. Appx. 420, 422 (2d Cir. 2005) ("The law in this circuit is clear that [18 U.S.C. § 1341] does not support any private right of action."); Kirk v. Heppt, 532 F. Supp. 2d 586, 590 (S.D.N.Y. 2008) ("[T]here is no private right of action for violations of the federal mail fraud statute."). Indeed, Plaintiff responds not by defending Count Three as standing alone, but by asserting that allegations of mail fraud can "assist in establishing another legal violation" under § 1983. (Pl. Opp. at 9). On the narrow question, however, of whether Plaintiff can pursue Count Three as its own cause of action, the answer is that she cannot. That claim is dismissed.

### 2. Count Four: Antitrust Allegations

Even assuming Plaintiff has shown Article III standing, "an antitrust plaintiff must also establish antitrust standing." In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009). First, a plaintiff must show that she has sustained an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Daniel v. Am. Bd. of Emergency Medicine, 428 F.3d 408, 438 (2d Cir. 2005) (emphasis in original). Second, a plaintiff must show that she is a proper plaintiff. See In re DDAVP, 585 F.3d at 688 (listing four factors for consideration). It is not necessary to reach the second prong of the analysis because Plaintiff fails to allege that she sustained an antitrust injury.

Plaintiff claims (without identifying a particular statute) that the City "violated antitrust laws designed to protect fair competition" by using its "monopoly over the New York City

personal injury law practice" to interfere with the work Plaintiff's firm received. (SAC ¶ 85). Plaintiff states that the City's actions resulted in the "unfair loss" of her employment to defend Con Edison, and that she "has not and will not receive any cases defending [the City]," which "is destructive, even fatal, to Plaintiff and her firm's ability to fairly compete and earn a meaningful income in the personal injury/insurance defense trade." (SAC ¶¶ 90, 91).

The Second Circuit has observed, however, that "[t]he claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up." Daniel, 428 F.3d at 439 (quoting Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1995)). Plaintiff does not specify what damages she seeks under Count Four other than generally requesting damages "for loss of income resulting in the reassignment of the Con Edison case." (SAC at 26). Her complaint therefore alleges only her personal loss of income and case assignments without sufficient facts to support the notion that competition overall has been reduced.[2] Such allegations are insufficient to confer standing because "the antitrust laws . . . were enacted for 'the protection of competition, not competitors,'" Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., 429 U.S. 477, 488 (1977) (quoting Brown Shoe v. United States, 370 U.S. 294, 320 (1962) (emphasis added)). Having failed sufficiently to allege facts supporting the first prong of the standing analysis, Plaintiff's antitrust claim is dismissed.

---

[2] The Plaintiff argues for the first time in her opposition papers that her interest "coincides with the public interest" because she is "seeking to end, as opposed to join, the control of defendant government officials whose practice of unlawful discriminatory conduct in awarding legal contracts has resulted in qualified black attorneys or firms, such as Plaintiff, not having a fair opportunity to compete" for case assignments. (Pl. Opp. at 10-11). Even if such allegations were sufficient to confer antitrust standing, which they are not, it is well established that "a complaint cannot be modified . . . by papers filed in response to a dispositive motion to dismiss or for summary judgment." Brownstone Inv. Group, LLC. v. Levey, 468 F. Supp. 2d 654, 660 (S.D.N.Y. 2007).

### 3. Count Five: Interference with the Administration of Justice

Plaintiff argues that Defendants were knowingly involved in submitting false information to the EEOC that Plaintiff had applied for a supervisory position in the Pensions Division to justify denying her request for a transfer. (SAC ¶¶ 93, 94). Plaintiff alleges that Defendants thereby prevented her from receiving a fair process and from having her case reviewed by the U.S. Department of Justice. (SAC ¶ 95). Defendants argue that Plaintiff, who does not specify the statutory basis for this claim, is attempting to seek relief pursuant to a criminal statute, 18 U.S.C. § 1505, which does not provide for a private right of action. (Def. Mem. at 9-10).

In response, Plaintiff – who does not address Defendants' criminal statute argument – states simply that "[f]alsification of information by government officials is a violation of an individual's rights to due process and fundamental justice." (Pl. Opp. at 11). For this proposition she relies on a single case, Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123 (2d Cir. 1997), an action for false arrest and malicious prosecution under § 1983. Plaintiff appears to argue that the "fabricated confession" at the heart of Ricciuti is somehow analogous to the fabricated information she alleges in her own action. This contention is without merit. Not only are the facts completely inapposite, but the Ricciuti court was examining the confession in the wholly different context of qualified immunity. As Plaintiff has provided no basis in law for this claim – and therefore no jurisdictional hook – it is dismissed.

### 4. Count Seven: Conflict of Interest

Plaintiff states that the City has "a conflict in its public role of selecting and awarding funds to private law firms – particularly in matters that relate to specific services Plaintiff or her business provides – and in its role in defending against Plaintiff's legal claims." (SAC ¶ 109). Plaintiff alleges that the process employed by the City to select outside counsel "unlawfully

discriminate[s]" against firms with minority ownership, (SAC ¶ 110), and that with regard to Plaintiff's particular case, Defendants "were personally motivated to prolong litigation at taxpayers' expense in an effort to punish" her, (SAC ¶ 121). Even if the Court were able to construe a statutory basis for this claim, which it cannot, Defendants are correct in their assertion that Plaintiff has not alleged an injury that would confer standing. (Def. Mem. 15-16).

To establish Article III standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Env'l Servs. (TOC), Inc., 528 U.S. 167, 180-81, (2000). Although Plaintiff concedes she has not actually "submitted an application to the City for legal assignments," she argues (1) that such an act is unnecessary to prove that Defendants "do not want her to work for the City"; and (2) that the "the harm is imminent" because the application process could begin "any moment" with criteria that exclude her. (Pl. Opp. at 13). Her arguments are unavailing because such exclusion is entirely hypothetical under the facts she provides. It also is insufficient that she has "already described in [the previous counts] her personal experience with these defendants," (Pl. Opp. at 13), because "a plaintiff must demonstrate standing for each claim and form of relief sought," Baur v. Veneman, 352 F.3d 625, 642 n.15 (2d Cir. 2003). Accordingly, this claim is dismissed.

**B. §§ 1983 and 1985: Count Six**

**1. Statute of Limitations**

No party disputes that the applicable statute of limitations period governing §§ 1983 and 1985 actions is three years from the time the claim accrued. See Paige v. Police Dept. of

Schenectady, 264 F.3d 197, 199 n.2 (2d Cir. 2001) ("The statute of limitations for actions brought pursuant to §§ 1983 and 1985 is three years."). They also do not dispute that, under federal law, the claim accrues "when the plaintiff knows or has reason to know of the harm." Washington v. County of Rockland, 373 F.3d 310, 317 (2d Cir. 2004). As Plaintiff commenced this action on June 29, 2011, Defendants argue that all claims based on events prior to June 29, 2008, are time-barred. (Def. Mem. at 10). In response, Plaintiff asserts that a "continuous, ongoing practice of retaliatory/discriminatory conduct" has occurred "since her employment with the City of New York" and "requests the Court apply the continuing violation doctrine." (Pl. Opp. at 5). The Court declines to do so.

As the Supreme Court has explained with regard to Title VII, incidents of employment discrimination are either discrete acts or constitute continuing violations. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114-16 (2002). A discrete act, such as when an employer choses to deny a transfer request, has a fixed point in time. See id. at 14 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify."). Indeed, each discrete act is "a separate employment practice . . . , even if that action is simply a periodic implementation of an adverse decision previously made." Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134 (2d Cir. 2003). Moreover, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Workneh v. Pall Corp., No. 10-CV-3479, 2012 WL 4845836, at *6 (E.D.N.Y. Oct. 11, 2012) (quoting Morgan, 536 U.S. at 113). The same approach has been applied in the § 1983 context. See, e.g., Smith v. New York City Dept. of Educ., 09 Civ. 9256, 2011 WL 5118797, at *5 (S.D.N.Y. Oct. 28, 2011) (dismissing § 1983 claims because "although the plaintiff may allege a relationship among these [discrete] acts, that is not sufficient to constitute a continuing

violation"); Fahs Const. Group, Inc. v. Gray, No. 10-CV-0129, 2011 WL 294269, at *6 (N.D.N.Y. Jan. 27, 2011) (finding continuing violation doctrine inapplicable and dismissing §1983 claims); Sackey v. City of New York, No. 04 Civ. 2775, 2006 WL 337355, at *5 (S.D.N.Y. Feb. 15, 2006) ("Plaintiff may not recover for denials of promotion that occurred outside the statutory time period, even if other acts of discrimination occurred within the statutory time period."). Furthermore, in this Circuit the continuing violation doctrine generally is "viewed . . . with disfavor" and "only compelling circumstances will warrant application of the exception to the statute of limitations." Quadrozzi Concrete Corp. v. City of New York, 03-CV-1905, 2004 WL 2222164, at *8 (S.D.N.Y. Sept. 20, 2004).

As of the June 29, 2008, time bar, Plaintiff had already been terminated from the midtown firm and had recently opened her solo practice. Accordingly, Defendants' refusal to transfer and/or promote her to a high profile division, her constructive termination from SLU, and any retaliation that occurred while she was there, constitute discrete acts that occurred outside the limitations period. For that reason, the individual Defendants named with regard to these acts, Pestana, Majerus, Goode-Trufant, Smith, Leoussis, Palomino, Davidow, Andes, Gallay, Mills, Van Eysden, Rundbaken, Dumain, Rubin, and Taussig, are dismissed from the case. Similarly, Plaintiff's due process claim is dismissed because the EEOC investigation and purportedly false submissions occurred prior to June 29, 2008. (SAC ¶ 99(d)). Indeed, the only actionable conduct during the statutory window appears to concern interference (1) with Plaintiff's mail, (SAC ¶ 99(b)); and (2) with her "ability to obtain and maintain work or work-related opportunities or contracts," (SAC ¶ 99(d)).

**2. Remaining §1983 Claims**

To maintain a § 1983 action, a plaintiff must allege both that the conduct complained of was "committed by a person acting under color of state law" and "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994). Moreover, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). A plaintiff cannot base a defendant's liability on respondeat superior or on "linkage in the . . . chain of command." Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003).

**a. First Amendment: Retaliation**

Whether certain speech is protected under the First Amendment is a question of law for the Court. Ezekwo v. N.Y. City Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991). Establishing whether speech by a public employee is so protected "first requires determining whether the employee spoke as a citizen on a matter of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). To qualify as a matter of public concern, an employee's speech must "be fairly considered as relating to any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146 (1983). In contrast, speech that "primarily concerns an issue that is 'personal in nature and generally related to [the speaker's] own situation,' such as his or her assignments, promotion, or salary, does not address matters of public concern." Jackler v. Byrne, 658 F.3d 225, 236 (2d Cir. 2011) (quoting Ezekwo, 940 F.2d at 781). Assuming the truth of her allegations, Plaintiff's EEOC complaints concerned unfair treatment and denial of transfers, which involves her own situation and is not a public matter. Her First Amendment claim therefore is dismissed in its entirety.

**b. Fourth Amendment: Mail Interference**

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As to the mail, "courts ordinarily recognize a legitimate expectation of privacy in letters and other sealed packages" under the Fourth Amendment. United States v. Soto-Teran, 44 F. Supp. 2d 185, 192 (E.D.N.Y. 1996); see United States v. Jacobsen, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy."); United States v. Villarreal, 963 F.2d 770, 774 (5th Cir. 1992) (both "senders and addressees" have reasonable expectation of privacy in packages)).

In this case, Plaintiff alleges that the City, Cardozo, and Majerus have violated her right to privacy by opening and/or seizing her sealed mail. (SAC ¶¶ 77-80, 99(b)). Specifically, she claims Majerus and Cardozo, who collaborate on the "policies for the mailroom," "have established, implemented, sanctioned, accepted or caused the deliberate practice at the City of retaining, opening, and reviewing mail sent to Plaintiff and Plaintiff's business" in retaliation for her complaints and in violation of her Fourth Amendment rights. (SAC ¶¶ 76, 77). This action presents a rather unusual situation because Plaintiff's former employer happens to be the City and therefore the individual defendants are state actors for purposes of § 1983; had she worked for any private entity, that would not be true. In any event, Defendants argue – without citing cases – that Plaintiff's claim is "insufficient as a matter of law" because she claims Cardozo and Majerus are only "liable by virtue of their positions of authority." (Def. Mem. at 12). It is true that supervisory officials may not be held liable merely because they hold a position of authority. The Second Circuit has explained, however, that personal involvement may be shown instead by "direct participation in the violation, the creation of the unconstitutional policy pursuant to which

the violation occurred, a failure to remedy a known wrong, grossly negligent supervision of the wrongdoers, or deliberate indifference to known circumstances likely to cause a constitutional violation." Samuels v. Selsky, 166 Fed. Appx. 552, 556 (2d Cir. 2006) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)). At this early stage in the litigation, Plaintiff has sufficiently alleged that Cardozo and Majerus created an unconstitutional policy regarding her mail, which caused her to suffer injuries within the § 1983 limitations period. As Defendants have not addressed this potential ground for liability, the Fourth Amendment claim survives as to Cardozo and Majerus.

**c. Fourteenth Amendment: Equal Protection and Due Process**

The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated be treated alike." LaTrieste Rest. v. Vill. of Port Chester, 188 F.3d 65, 69 (2d Cir. 1999) (internal quotation marks omitted). To establish an equal protection claim, a plaintiff must show "adverse treatment of individuals compared with other similarly situated individuals and that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Miner v. Clinton Cnty., 541 F.3d 464, 474 (2d Cir. 2008) (internal bracketing omitted).

In this case, Plaintiff alleges that "each defendant has deprived Plaintiff and other racial minorities of an equal opportunity to earn a living" as an attorney, compared to white attorneys and white-owned law firms. (SAC ¶ 99(c)). With regard to the events not time-barred under § 1983, Plaintiff contends that "the City discriminates in how it allocates . . . legal assignments to private firms" using a "process that has an unlawful disparate impact on racial minorities." (SAC ¶ 102). Specifically, Plaintiff alleges that the long period served by outside legal panels

favors "law firms owned by white males [that] have historically established and maintained long ties with government agencies and officials," while it disfavors "women and minority firms" that tend to be newer. (SAC ¶ 112). Plaintiff states that her firm "has not and cannot reasonably expect to receive a contract for legal services from the City because of this conflict and the retaliatory interests of the individual defendants." (SAC ¶ 114). Defendants argue that Plaintiff's claim fails because she has not alleged she ever submitted a proposal that was rejected. (Def. Mem. at 15).

As an initial matter, Plaintiff fails to allege personal involvement with regard to these events. Moreover, it does not appear that Plaintiff has established standing. Even if her pleading is read to suggest that the City would exclude her from legal assignments due to her race (as well as in retaliation for her complaints), such exclusion has not yet occurred because she has not alleged that she submitted an application. "Since plaintiff never applied for [assignments] under the program, and therefore has not been denied [assignments] thereunder, she has not yet personally suffered an injury which this court can redress." Frasier v. U.S. Dep't of Health and Human Svs, 779 F. Supp. 213, 223 (N.D.N.Y. 1991) (emphasis in original); see also Vandor, Inc. v. Militello, No. 00-CV-0756, 2001 WL 135818, at *6 (W.D.N.Y. Feb. 16, 2001) ("Inasmuch as plaintiff never applied for . . . and could not have been therefore denied such benefits . . . plaintiff . . . has no standing to pursue this particular cause of action."). Accordingly, Plaintiff's equal protection claim is dismissed. As to Plaintiff's due process claim, the Court has already dismissed that cause of action in its entirety because it arises from the EEOC investigation, which took place outside the limitations period. (SAC ¶ 99(d)).

**d. Municipal Liability**

Municipalities, like supervisors, cannot be liable under a theory of respondeat superior. Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691 (1978). Instead, a plaintiff seeking to hold a city liable under § 1983 must "plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007). In this case, only Plaintiff's Fourth Amendment claim remains under § 1983. (SAC ¶ 99(b)). As noted, she alleges the existence of a policy to interfere with her mail to cause her professional injury. (SAC ¶¶ 74-83). At this early stage of the litigation, the Court is not prepared to dismiss Plaintiff's municipal liability claim, even if the alleged policy targets only her. See Housing Works, Inc. v. Turner, No. 00 Civ.1122, 2004 WL 2101900, at *30 (S.D.N.Y. Sept. 15, 2004) ("[I]t seems reasonable to conclude that [Monell's] teachings are equally applicable to a specific policy directed at just one individual, as long as the pleaded facts support the inference that unconstitutional action was taken against the individual pursuant to such policy.") (quoting Turpin v. Mailet, 619 F.2d 196, 202 n.7 (2d Cir. 1980)). Plaintiff's municipal policy claim under the Fourth Amendment therefore survives the motion to dismiss.[3]

[3] It is also true that "a municipality can be held liable for a discrete act taken by a municipal employee . . . where the employee possesses final policymaking authority in the area in which the action was taken." Brown v. Baldwin Union Free School Dist., 603 F. Supp. 2d 509, 517 (E.D.N.Y. 2009). Nevertheless, this principal applies only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Carroll v. City of Mount Vernon, 707 F. Supp. 2d 449, 458-59 (S.D.N.Y. 2010) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)). Plaintiff has not alleged that Cardozo or Majerus possess such authority in the area concerning her Fourth Amendment claim.

### 3. Conspiracy Claim

To state a cause of action under § 1985, a plaintiff must allege "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir.1999). A plaintiff must also allege that the conspiracy was motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus." Id. (quoting Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1088 (2d Cir. 1993)). A complaint containing only "'conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights' will be dismissed." Marcel v. United States, No. 12-CV-4404, 2012 WL 5463926, at *4 (E.D.N.Y. Nov. 8, 2012) (quoting Ostrer v. Aronwald, 567 F.2d 551, 553 (2d Cir. 1977)).

Defendants argue that the intracorporate conspiracy doctrine should apply. (Def, Mem. at 13-15). Under this doctrine, a plaintiff fails to state a §1985 conspiracy claim "if the conspiratorial conduct challenged is essentially a single act by a single corporation [or municipal entity] acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." Dilworth v. Goldberg, No. 10 Civ. 2224, 2012 WL 4017789, at *28 (S.D.N.Y. Sept. 13, 2012) (quoting Hermann v. Moore, 576 F.2d 453, 459 (2d Cir. 1978)); see also Hartline v. Gallo, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (affirming dismissal of § 1985 conspiracy claim where defendants were all Southampton Police Department employees). That continuing, separate instances of discrimination are alleged does not change the application of this doctrine. Dilworth, 2012 WL 4017789 at *29. An exception exists, however, where a plaintiff alleges facts that tend to show the defendants were "pursuing personal interests wholly

separate and apart from the entity." Hartline v. Gallo, No. 03 Civ. 1974, 2006 WL 2850609, at *9 (E.D.N.Y. Sept. 30, 2006) (rev'd on other grounds).

In this case, Plaintiff claims that when she opened her law practice at 100 Church Street – the same building where she had worked in the Torts Division – Cardozo and Majerus "began to scheme and cause the willful intentional, or deliberate seizing, opening, reading, and retaining of U.S. mail, including privileged and confidential information, that was correctly addressed to Plaintiff or her law office." (SAC ¶ 78). She further alleges that "these defendants" used the "wrongfully obtained information . . . to cause plaintiff's firm to lose a case assignment in which it had been defending Con Edison, . . . damag[ing] Plaintiff's income opportunity and contractual relationship." (SAC ¶¶ 79-80). As an initial matter, Plaintiff confusingly names only Cardozo and Majerus as part of her purported mail fraud claim, but names all Defendants in her Fourth Amendment § 1983 claim. She makes no attempt to clarify this issue or the roles of Defendants in her opposition papers, stating only that the intracorporate conspiracy doctrine should not apply because the actions were "motivated by the personal interests of the officials." (Pl. Opp. at 7). Yet, even if the intracorporate doctrine is inapplicable here, Plaintiff has made only generalized allegations about the conspiracy, failing to attribute specific roles or facts to individual Defendants. Accordingly, her §1985 conspiracy claim is dismissed.

Similarly, while the Second Circuit has not explicitly extended the application of the intracorporate conspiracy doctrine to claims brought under § 1983, many district courts in the Second Circuit have done so and "the Southern District squarely held that [it] should be applied to § 1983 cases." Rahman v. Fischer, No. 9:10-CV-1496, 2012 WL 4492010, at * 13 (N.D.N.Y. Sept. 28, 2012); see Anemone v. Metro. Transp. Auth., 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006) (applying doctrine to § 1983 claim and noting that even without conspiracy claim,

plaintiffs asserting constitutional injuries may still assert direct claims against individuals and against municipalities). A conspiracy claim under §1983 must allege "(1) an agreement between two or more state actors . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Pangburn v. Culbertson, 200 F.3d 67, 72 (2d Cir. 1999). As with her § 1985 claim, Plaintiff has failed to allege with particularity what acts individual defendants took and what agreement they entered. See Horn v. Brennan, 304 F. Supp. 2d 374, 379 (E.D.N.Y. 2004) (dismissing §1983 claim against County supervising attorney because, inter alia, "plaintiff fails to allege with particularity . . . who was involved in the conspiracy"). Plaintiff's § 1983 conspiracy claim therefore is dismissed.

## IV. DISCOVERY RULINGS

The Federal Rules of Civil Procedure provide that the scope of discovery includes "any non-privileged matter that is relevant to any party's claims or defense." Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id. While the "regime . . . is an extremely permissive one," district courts have "broad discretion to manage the manner in which discovery proceeds" and limit it "when the facts and circumstances are such that it creates an inappropriate burden or hardship." In re Subpoena Issued to Dennis Friedman, 350 F.3d 65, 69 (2d. Cir. 2003).

### A. Standard of Review

A magistrate judge is authorized "to make findings as to non-dispositive pretrial matters, such as discovery matters, which may not be disturbed by a district judge absent a determination that such findings were 'clearly erroneous or contrary to law.'" Garcia v. Benjamin Group Enter.

Inc., 800 F. Supp. 2d 399, 403 (E.D.N.Y. 2011) (citing 28 U.S.C. § 636(b)(1)(A); Fed. R.Civ. P. 72(a)). Under this highly deferential standard of review, a district court may reverse the finding only if "on the entire evidence," the district court is "left with the definite and firm conviction that a mistake has been committed." Easley v. Cromartie, 532 U.S. 234, 242 (2001). Simply put, "a party seeking to overturn a discovery order bears a heavy burden." AP Links, LLC v. Global Golf, Inc., No. 08-CV-1730, 2011 WL 888261, at *4 (E.D.N.Y. Mar 14, 2011).

**B. Objections**

Plaintiff has listed five objections to certain discovery rulings Magistrate Judge Ramon E. Reyes made during a September 19, 2012, conference (Docket No. 74, ("Tr.")). For the following reasons, Plaintiff's request to vacate Judge Reyes' rulings is denied.

**1. Treatment of other Black Female Attorneys**

In her objections, Plaintiff claims that Judge Reyes incorrectly "denied all discovery as related to the other black female attorneys who were attorneys in Torts but not in SLU while I was employed there, and who did not seek the exact same benefit or opportunity I sought." (Docket No. 82 at 2). Plaintiff explained at the conference that the statistics would help support her argument that "there is a retention problem of minority attorneys" who feel they cannot "move ahead" because of discrimination. (Tr. at 45). In response, Judge Reyes instructed defense counsel to investigate what statistics were available "[o]n outgoing attorneys from the entire Corporation Counsel's Office and whether we record diversity statistics on outgoing folks." (Tr. at 49). The Court does not find Judge Reyes' ruling, which seemingly allows Plaintiff access to statistics (if available) regarding retention, clearly erroneous or contrary to law.

**2. Promotion of Attorney after Plaintiff's Departure**

Plaintiff next argues that Judge Reyes erred in denying her request for discovery "to support my claim that my constructive termination in 2007 assisted the promotion to senior counsel" of a white attorney, "Peggy." (Docket No. 82 at 2). Plaintiff essentially argues that Peggy, who was in the same 2003 SLU class, received a promotion with less trial experience than Plaintiff had, and that if Plaintiff had stayed "it would have been . . . contentious if they had given her senior counsel over me because I had more years and more experience." (Tr. at 120). Judge Reyes rejected Plaintiff's request, stating that such a claim is "pure speculation." (Tr. 120; see Tr. 121-22). This Court agrees. See Tottenham v. Trans World Gaming Corp., No. 00 Civ. 7697, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002) ("Discovery requests cannot be based on pure speculation or conjecture.").

**3. SLU Cases Assigned to Plaintiff**

Plaintiff also seeks documents related to her handing of three cases she was assigned as an SLU attorney, and objects to Judge Reyes' limiting production to communication such as emails. (Docket No. 82 at 2-3). During the conference, Plaintiff explained that she sought information to show how her work on the three cases was evaluated by her supervisors because "the evaluation . . . is used as a tool for promotions." (Tr. at 199). She stated, "there's a reason for me to wonder if [the EEOC complaint] had been informally discussed or inquired about," conceding that she didn't know by whom. (Tr. at 200). Judge Reyes ruled that Plaintiff could get such information through the e-mail communications and stated that "if there's something you believe outside of that, you can question people at depositions." (Tr. at 201). Judge Reyes also directed Plaintiff to provide the docket numbers for the three cases so that Defendants could

produce each case file or determine whether it is archived. (Tr. at 205). The Court finds no reason to vacate these rulings.

**4. Mail Tampering**

Judge Reyes granted Plaintiff's request for discovery related to the alleged opening of her mail, but limited the period through 2011, when the last known tampering occurred. (Tr. at 190). Plaintiff argues that she "should be entitled to discern whether there has been any further tampering with my mail beyond that date," through the present. (Docket No. 82 at 3). The Court disagrees and declines to vacate Judge Reyes' ruling. See United States v. Consolidated Edison Co. of New York, No. CV-88-0049, 1988 WL 138275, at *2 (E.D.N.Y. Dec. 15, 1988) (denying motion to compel where "plaintiff's interrogatories constitute no more than a 'fishing expedition' by plaintiff to discover additional violations beyond those alleged in the complaint").

**5. Statistics on Diversity and Complaints; Mill's Personnel Files**

Plaintiff claims that Judge Reyes improperly "denied statistical information regarding the number of attorneys at the department and their diversity data," as well as "statistics related to EEO[C] claims that had been filed by black attorneys." (Docket No. 82 at 3). This objection is without merit. As an initial matter, Judge Reyes advised Plaintiff that the general department diversity statistics are most likely "available in some publicly available format . . . . You need to find it there." (Tr. at 198). Moreover, with regard to EEOC claims, Judge Reyes directed that Defendants provide all "EEO[C] complaints against [Plaintiff's supervisors] for race and gender and any letters or disciplinary warnings or anything in their personnel files," (Tr. at 94), as well as for the prospective supervisors with whom Plaintiff interviewed, (Tr. at 103). The Court finds no error with these rulings.

Judge Reyes did deny Plaintiff's request for similar information regarding Foster Mills, who, according to Plaintiff, "coordinates the department-wide transfer" program and "gives you the decision" about transfer applications. (Tr. at 105). Plaintiff conceded that Mills is essentially the "messenger" and Judge Reyes denied her request for his personnel file, stating that he wanted to see an indication that Mills "had some actual role . . . other than as the conduit for the requests and the results," (Tr. at 106), because "he doesn't sound like he's a decision-maker and I have no reason to think that they violated a policy," (Tr. at 112). Judge Reyes' ruling was entirely reasonable. Again, Plaintiff has not met the heavy burden required of a party seeking to overturn a discovery order.

## V. CONCLUSION

For the reasons set forth above, Defendants' partial motion to dismiss (Docket No. 57) is GRANTED in part and DENIED in part. Accordingly, Plaintiff's only surviving claims include:

1. the First and Second Counts, pursuant to Title VII, (which were not included in this motion to dismiss), against the City; and

2. the Sixth Count, pursuant to §1983 under the Fourth Amendment, against the City, Cardozo, and Majerus.

All other Counts and individual defendants are dismissed from the action. Additionally, Plaintiff's request to vacate various discovery rulings (Docket No. 82) is DENIED in its entirety.

**SO ORDERED.**

/SANDRA L. TOWNES
United States District Judge

Dated: January 11, 2013
Brooklyn, New York