# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

———————————————

No. 11-CV-3234 (PKC) (RER)

———————————————

MELISSA PRESSLEY,

Plaintiff,

VERSUS

CITY OF NEW YORK, MICHAEL CARDOZO, AND KENNETH MAJERUS,

Defendants.

———————————————

**REPORT AND RECOMMENDATION**

August 27, 2015

———————————————

**TO THE HONORABLE PAMELA K. CHEN, UNITED STATES DISTRICT JUDGE:**

**Ramon E. Reyes, Jr., U.S.M.J.**:

Plaintiff Melissa Pressley ("Plaintiff") brings this action alleging employment discrimination and retaliation against remaining Defendants the City of New York, Michael Cardozo ("Cardozo"), and Kenneth Majerus ("Majerus") (collectively, "Defendants"). Plaintiff's surviving claims include violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e, and violations of her constitutional rights pursuant to 42 U.S.C. § 1983. (*See generally* Dkt. No. 21 ("Compl").) Before the Court are the parties' cross motions for summary judgment. For the reasons stated below, I respectfully recommend that Defendants' motion for summary judgment be granted and Plaintiff's cross motion for summary judgment be denied.

## BACKGROUND

### I.  Local Rule 56.1

Local Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York requires a party opposing a motion for summary judgment to submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and

concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Rule 56.1(b). In response to Defendants' Motion for Summary Judgment, Plaintiff filed papers that she deemed both a Response to Defendants' Motion, as well as her own Cross Motion for Summary Judgment. (*See* Dkt. No. 188.) These papers, however, did not include "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party" as the Local Rules require. Plaintiff only submitted her own 56.1 Statement of Material Facts. Plaintiff fails to directly address her lack of compliance with the Local Rules, but instead argues that her 56.1 Statement of Material Facts in support of her Cross Motion is "a way of opposing [Defendants'] statement." (Dkt. No. 190 at 2.)

While the Local Rules do require Plaintiff to submit her own 56.1 Statement of Material Facts in connection with her Cross Motion for Summary Judgment, such a submission does not also satisfy her obligations under the Local Rules with respect to opposing Defendants' Motion for Summary Judgment. Plaintiff did not adequately dispute any of the statements contained within Defendants' 56.1 Statement of Material Facts, such that they are therefore deemed admitted to the extent they are not conclusory and adequately supported by evidence in the record. *See Thomas v. City of N.Y.*, 953 F. Supp. 2d 444, 449 n.1 (E.D.N.Y. 2013) (citing *Giannullo v. City of N.Y.*, 322 F.3d 139 (2d Cir. 2003)); *see also* Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly

numbered paragraph in the statement required to be served by the opposing party").

Turning to Plaintiff's own 56.1 Statement of Material Facts, I first note that Plaintiff submitted two versions, an original and an amended. (Dkt. Nos. 188-3, 190-1.) Plaintiff did not seek leave of the Court to file her Amended Local Rule 56.1 Statement of Material Facts, but instead submitted it with her Reply in support of her Cross Motion and in response to the instant motion. (Dkt. No. 190-1.) Plaintiff's Amended Local Rule 56.1 has modified and additional citations purportedly in support of the statements, as well as a modification to language in one paragraph and the addition of two paragraphs. (Dkt. No. 190-1.) Defendants argue that Plaintiff's Amended Local Rule 56.1 "fails to provide a basis for the Court to grant summary judgment in her favor" and the statements are not supported "with citations to admissible evidence . . . ." (Dkt. No. 183 at 6.)

In any event, Defendants have had an opportunity to respond to and oppose Plaintiff's Amended Local Rule 56.1 in both its opposition to same and within their sur-reply memorandum of law. (Dkt. Nos. 183, 184.) Accordingly, I will consider Plaintiff's Amended Local Rule 56.1, but only in conjunction with Plaintiff's Cross Motion for Summary Judgment and to the extent that it complies with both the Federal Rules of Civil Procedure and the Local Rules. *See McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101 (JFB) (WDW), 2007 WL 2702348, *1 n.1 (E.D.N.Y. Sept. 12, 2007) (holding that "Rule 56.1 does not prohibit the consideration of untimely statements, at least where the admission of the statement will not prejudice an opposing party" and that "acceptance of defendants' amended 56.1 filings will not

unfairly prejudice plaintiffs" where "they have had an opportunity to respond to the assertions therein") (citations omitted); *see generally Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

With regard to Defendants' argument that the statements contained in Plaintiff's Amended Local Rule 56.1 are unsupported by the record, the Court, as with any of the filings made pursuant to Local Civil Rule 56.1, "in its analysis of the motion[s] for summary judgment, will only consider relevant evidence that is admissible pursuant to the . . . frame-work established in Rule 56(e) of the Federal Rules of Civil Procedure and Local Rule 56.1." *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 569 (E.D.N.Y. 1999). To the extent that Plaintiff has failed to cite admissible evidence in compliance with Local Rule 56.1, the Court "may in its discretion opt to 'conduct an assiduous review of the record . . . .'" *Holtz*, 258 F.3d at 73 (quoting *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)). However, the Court is "entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material. Judges are not like pigs, hunting for truffles buried in the record." *Gallimore-Wright v. Long Island R.R. Co.*, 354 F. Supp. 2d 478, 488 (S.D.N.Y. 2005) (quoting *Alrechtsen v. Bd. of Regents of the Univ. of Wis. Sys.*, 309 F. 3d 433, 436 (7th Cir. 2002)).[1]

_____

[1] I reject Plaintiff's argument that her memorandum "contain[s] substantial evidentiary value" because "[P]laintiff is a witness and party to this action with personal knowledge of the facts alleged therein, except where reference is made to other sources or citations, and is admitted to practice in the EDNY." (Dkt. No. 190 at 1.) Putting aside that Plaintiff fails to direct this Court to any case law to support her claim that a represented party's signature on a memorandum of law turns it into evidence, it is well-settled law that a memorandum of law is not evidence. *Giannullo*, 322 F.3d at 142 (finding memorandum of law in support of motion for summary judgment "not evidence at all"); *DeFilippo v. N.Y. State Unified Court Sys.*, No. 00-CV-2109 (NGG) (JMA), 2006 WL 842400, at *17 n.13 (E.D.N.Y. 2006) (refused to give evidentiary value to statements in memorandum of law by *pro se* plaintiff who was also attorney). Similarly, to the extent that Plaintiff makes the same argument with regards to the Local Rule 56.1 Statement of Material Facts, "a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz*, 258 F.3d at 74 (2d Cir. 2001); *see also Perez v. de la Cruz*, No. 09 Civ. 264 (JPO), 2013 WL 2641432, at *8 (S.D.N.Y. Jun. 12, 2013) (holding "Rule 56.1 statement is not evidence" (citing *Giannullo*, 322 F.3d at 140)).

## II. Undisputed Facts for Purposes of Defendants' Motion[2]

The New York City Law Department, Office of the Corporation Counsel ("Law Department") is responsible for all of the legal affairs of the City of New York. (Dkt. No. 174 ¶ 1.) The Corporation Counsel and Assistant Corporation Counsels ("ACC") represent the City of New York. (*Id.*) During the relevant time, Cardozo was the Corporation Counsel. (*Id.* ¶ 6.) The Law Department consists of seventeen legal divisions, including the Tort Division, which is the largest division. (*Id.* ¶ 2.) The Tort Division has local offices in the five boroughs, as well as specialized units. (*Id.* ¶ 9.) During Plaintiff's employment Fay Leoussis ("Leoussis") was the Chief of the Tort Division. (*Id.* ¶ 10.) The Special Litigation Unit ("SLU") of the Tort Division handles and litigates high-profile, complex, and catastrophic injury cases in both federal and state courts. (*Id.* ¶ 30.) The cases that the SLU handles span all five boroughs. (*Id.* ¶ 35.)

Plaintiff graduated from the City University of New York School of Law in 2003 and applied to the Law Department for an ACC position within the Tort or Family Court Division in September 2003. (*Id.* ¶ 23.) Plaintiff is African-American and Christian. (*Id.* ¶ 5.) Plaintiff was employed at the Law Department as an ACC in the SLU of the Tort Division from March 1, 2004 until November 16, 2007. (*Id.* ¶¶ 4, 28-29.)

While Plaintiff was employed at the Law Department Mark Palomino ("Palomino") was the Chief of SLU. (*Id.* ¶ 32.) Plaintiff had four immediate supervisors during her tenure at SLU: Judith Davidow ("Davidow") from March 2004 to September 2004; Marc Andes ("Andes") from October 2004 until June 2006; Gayle Sanders ("Sanders") from June 2006 until her promotion to Deputy Chief of SLU; and Elizabeth Gallay ("Gallay") from Sanders' promotion to the end of Plaintiff's employment. (*Id.* ¶¶ 43, 45-48.)

Plaintiff worked with Davidow on a motion in the *Toure* case. (*Id.* ¶ 57.) While working on this motion Davidow requested that Plaintiff come into work the Sunday prior to the filing deadline, however Plaintiff advised that she could not come in on Sunday because that was the Sabbath. (*Id.* ¶ 58.) Plaintiff came into work on Monday. (*Id.* ¶ 59.) When Davidow emailed Plaintiff at 10:43 A.M. the day that the *Toure* papers were due, but did not receive a reply until 11:25 A.M., she advised Plaintiff to arrive at the office by 9:30 A.M. if she had papers due that day. (*Id.* ¶ 63.) Plaintiff subsequently complained about Davidow supervising her work and said that she "did not warm up to [Plaintiff]." (*Id.* ¶ 65.) Jenny Montana ("Montana") and Palomino then reassigned Plaintiff to be supervised by Andes. (*Id.* ¶¶ 65-66.)

---

[2] Because I am respectfully recommending that Defendants' motion for summary judgment be granted in its entirety with respect to Plaintiff's Title VII, Retaliation, and Fourth Amendment § 1983 claims, Plaintiff's cross motion for these same claims is accordingly denied. Therefore, for the sake of brevity I will dispense with a discussion of the undisputed facts solely for the purpose of Plaintiff's cross motion for summary judgment. Additional facts relevant to specific analysis of Plaintiff's claims will be presented in the appropriate section as necessary.

Plaintiff and Andes engaged in verbal disputes while he supervised her on motions in *Nunez* and *Shepherd*. (*Id.* ¶ 79.) After Plaintiff and Andes had a confrontation in which Andes called Plaintiff "unprofessional," she met with Palomino and Montana. (*Id.* ¶ 80.) Plaintiff agreed to have her supervisor changed from Andes to Sanders. (*Id.*) Plaintiff did not have any issues with Sanders, but when she was promoted to Deputy Chief of SLU, Gallay became Plaintiff's immediate supervisor. (*Id.* ¶¶ 81-82.)

ACCs in the Law Department received annual performance evaluations. (*Id.* ¶ 85.) Plaintiff did not agree with her 2004 and 2005 performance evaluations and submitted rebuttal letters to same. (*Id.* ¶ 87; Dkt. Nos. 176-9; 176-17.) Plaintiff met with Leoussis, Palomino, and Andes to discuss her concerns with her 2005 evaluation. (Dkt. No. 174 ¶¶ 94, 100.) At the meeting Plaintiff was granted leave to review and make comments to her 2005 evaluation. (*Id.* ¶¶ 95, 100.) A compromise was reached regarding the language that Plaintiff took issue with during the meeting, however she still submitted a written rebuttal to this evaluation. (*Id.* ¶¶ 100-101, 104; Dkt. No. 176-17.)

In April 2005 Plaintiff requested to be transferred to the Pensions Division. (Dkt. No. 174 ¶ 92.) In January 2006 Plaintiff requested to be released from the Tort Division prior to the transfer period. (*Id.* ¶ 102; Dkt. No. 176-16.) This request was denied. (Dkt. No. 174 ¶ 103.) In April 2006, as part of the annual transfer program, Plaintiff again requested to be transferred to the Pensions Division. (Dkt. No. 174 ¶105.) This request was denied. (Dkt. No. 176-19.) Plaintiff was offered a transfer out of SLU to a trial attorney position, however Plaintiff ultimately rejected the offer. (Dkt. No. 174 ¶ 108.)

On May 18, 2007, Plaintiff filed a formal Equal Employment Opportunity ("EEO") complaint with Muriel Goode-Trufant ("Goode-Trufant"), the Law Department's EEO Officer. (*Id.* ¶¶ 7, 144.) The relief Plaintiff sought in this complaint was a transfer out of SLU, primarily to Pensions. (*Id.* ¶ 146.) Cardozo, as Corporation Counsel, was the final decision maker with regards to EEO complaints during the relevant time. (*Id.* ¶ 147.) A letter dated October 16, 2007 to Plaintiff stated that "the Corporation Counsel has determined that there is not sufficient evidence to support a finding of discrimination and/or retaliation," however the letter also stated that "[t]he Corporation Counsel has determined that [Plaintiff] should be permitted to transfer to another unit of the Tort Division at the earliest possible opportunity." (*Id.* ¶¶ 150-151; Dkt. No. 176-29.) Further, the letter informed Plaintiff that "the Corporation Counsel has determined that there were supervisory failures by Mr. Palomino and Ms. Gallay . . . ." (Dkt. No. 176-29.) Additionally, "if there is an opportunity, given [her] skills and experience, for [Plaintiff] to transfer to another Law Department Division, such a transfer will be encouraged." (*Id.*) As a result of the letter Plaintiff was offered an immediate transfer out of SLU to another unit within the Tort Division or a trial position in a borough. (Dkt. No. 176-3 Tr. 103:2125, 104:14-15.) Plaintiff turned down these offers and requested to be transferred to another division. (Dkt. Nos. 174 ¶ 157; 176-30; 176-31.)

Goode-Trufant and Stuart Smith ("Smith") helped Plaintiff to schedule transfer interviews for five different divisions: Tax and Bankruptcy, Administrative Law,

Affirmative Litigation, Commercial and Real Estate Litigation, and Labor and Employment Law. (Dkt. Nos. 174 ¶ 160; 176-31.) Plaintiff interviewed with representatives from each of the above divisions, but she submitted her letter of resignation and resignation papers on November 7, 2007, prior to hearing from any of these five divisions as to whether they would grant her a transfer. (Dkt. No. 174 ¶¶ 161-167, 170-171.) Plaintiff's last day at the Law Department was November 16, 2007. (*Id.* ¶ 172.)

Prior to filing her EEO complaint, Plaintiff applied for an associate position at Malapero & Prisco LLP ("Malapero & Prisco") on October 15, 2007. (*Id.* ¶ 168.) Plaintiff was offered this position on November 2, 2007. (*Id.* ¶ 169.) Plaintiff began this position on December 7, 2007 and her immediate supervisor was Andrew Klauber ("Klauber"). (*Id.* ¶¶ 174-177.) On or about June 2, 2008, Klauber terminated Plaintiff's employment effective June 6, 2008. (*Id.* ¶¶ 186, 189.) Plaintiff then worked part-time for another law firm, Campbell & Associates, from December 2008 until August or September 2009. (*Id.* ¶ 190.)

Plaintiff opened her own law practice in 2009 and her office was located at 100 Church Street, in the same building that the Law Department's main office is located. (*Id.* ¶¶ 191-192.) She believed that the City of New York was opening her mail. (*Id.* ¶ 193.)

Operations is responsible for reviewing, opening, and processing between 1100 and 2400 pieces of mail delivered to the Law Department a day. (*Id.* ¶¶ 14, 197.) Majerus was the Chief of Operations from July 1997 until June 2013. (*Id.* ¶ 11.) Plaintiff claims she received four to six pieces of mail, originally opened by the Law Department,

that subsequently made their way to her. (*Id.* ¶ 207.) Plaintiff claims that she complained to both the Post Office and the Law Department regarding her mail being opened by the Law Department. (*Id.* ¶ 196.)

On August 22, 2008, Plaintiff filed a charge with the United States Equal Employment Opportunity Commission ("EEOC") alleging that she was discriminated and retaliated against. (*Id.* ¶ 209; Dkt. No. 176-37.) On April 4, 2011 the EEOC issued Plaintiff a "Dismissal and Notice of Rights" letter, which stated that "[b]ased on its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. . . . No finding is made as to any other issues that might be construed as having been raised by this charge." (Dkt. No. 174 ¶ 211.)

### III. **Procedural History**

Plaintiff filed her complaint on June 29, 2011 and her first amended complaint on October 24, 2011. (Dkt. Nos. 1, 6.) She filed her second amended complaint, which is the operative complaint in this action, on March 2, 2012. (Dkt. No. 21.) Defendants moved to partially dismiss Plaintiff's second amended complaint on July 31, 2912, which was granted in part and denied in part on January 11, 2013. (Dkt. Nos. 57, 89.) After the close of discovery the parties filed cross motions for summary judgment on October 24, 2014. (Dkt. Nos. 173, 188.) Your Honor referred these motions to me on April 6, 2015. (Order dated 04/06/2015.)

# DISCUSSION

## I. Summary Judgment Standard

The standard for summary judgment is well established. Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "The moving party bears the burden of establishing the absence of any genuine issue of material fact," *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010); *see Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006), after which the burden shifts to the non-moving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011); *see also F.D.I.C. v. Great Am/ Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The non-moving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 167 (2d Cir. 2009) (citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 247; *see also Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56-57 (2d Cir. 2012); *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005). The non-moving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation," *Jeffreys*, 426 F.3d at 554 (citations omitted); *see also DeFabio v. E. Hampton Union Free Sch. Dist.*, 623 F.3d 71, 81 (2d Cir. 2010), and must offer "some hard evidence showing that its version of the events is not wholly fanciful." *Miner v. Clinton Cnty.*, 541 F.3d 464, 471 (2d Cir. 2008). In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## II. Statute of Limitations

"Title 42 U.S.C. § 2000e-5(e)(1) is a charge filing provision that 'specifies with precision' the prerequisites that a plaintiff must satisfy before filing suit." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). Specifically, "[a]n individual must file a charge within the statutory time period . . . ." *Morgan*, 536 U.S. at 109. The charge must be filed with the Equal Employment Opportunity

Commission ("EEOC") within 300 days of the alleged discrimination because the existence of New York's State Division of Human Rights makes New York a deferral state for Title VII purposes, which applies the 300 day time period." *Harris v. City of N.Y.*, 186 F.3d 243, 247 n.2 (2d Cir. 1999) (citing 42 U.S.C. § 2000e-5(e)(1)); *Mohasco Corp. v. Silver*, 447 U.S. 807, 816-17 (1980)); *see, e.g.*, *Sinha v. N.Y.C. Dept. of Educ.*, 127 Fed. App'x 546, 547 (2d Cir. 2005).

Plaintiff filed her charged with the EEOC on August 22, 2008. (Dkt. No. 176-37.) Defendants move to dismiss as untimely Plaintiff's Title VII claims that accrued prior to October 27, 2007, *i.e.* 300 days prior to Plaintiff's EEOC charge. (Dkt. No. 175 at 14.) They further argue that

> to the extent that Plaintiff asserts that the 'continuing violation' doctrine should apply to her Title VII claims that accrued prior to October 27, 2007, Judge Townes has already ruled that Plaintiff's complained-of employment discrimination claims were discrete acts that occurred in a fixed point in time and, therefore, rejected Plaintiff's request to apply the continuing violation doctrine.

(*Id.* at 14-15.) With respect to the continuing violation theory, Plaintiff argues that the ruling that Defendants reference was a "ruling on [Plaintiff's] Section 1983 claims[, which] does not impose mandatory authority for this Court on [the] Title VII claims." (Dkt. No. 188-4 at 37.)

While Plaintiff is correct that Judge Townes addressed the continuing violation doctrine in the context of Plaintiff's Section 1983 and 1985 claims, *see Pressley v. City of*

N.Y., No. 11-CV-3234 (SLT) (RER), 2013 WL 145747, at *8-9 (E.D.N.Y. Jan. 14, 2013), the analysis for Title VII claims under the continuing violation doctrine is the same, *see Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 209 n.17 (E.D.N.Y. 2014) (recognizing that "the continuing violation exception to the limitations period is also recognized in the context of § 1983 claims" and analyzing with same standard). As discussed below, these claims are untimely.

"As the Supreme Court has explained with regard to Title VII, incidents of employment discrimination are either discrete acts or constitute continuing violations." *Pressley*, 2013 WL 145747, at *8 (citing *Morgan*, 536 U.S. at 114-16). "Discrete acts such as termination, failure to promote, *denial of transfer*, or refusal to hire are easy to identify." *Morgan*, 536 U.S. at 114 (emphasis added). "Moreover, each discrete act necessarily 'constitutes a separate actionable "unlawful employment practice."'" *Chin v. Port Authority of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012) (quoting *Id.*). "Both the employer and the aggrieved party may therefore rely on the clear and predicable statute of limitations when contemplating prospective litigation regarding failures to promote or other discrete acts." *Chin*, 685 F.3d at 157. "When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 649 (2007) (Ginsburg, J., dissenting).

All of the alleged incidents of employment discrimination of which Plaintiff complains are discrete acts—the Sabbath retaliation, negative evaluations, and transfer requests. Plaintiff alleges "a policy of discrimination

8

against Blacks, particularly black women, and against herself, as an individual, that existed throughout her career . . . ." (Dkt. No. 190 at 5.) However, within that same paragraph she concedes that "[s]he has identified *specific* acts of discrimination occurring from 2004 through November 2007, all related to the same incidents . . . ." (*Id.* at 5 (emphasis added).) "Discrete acts . . . which fall outside the limitations period, cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin*, 685 F.3d at 157.

Plaintiff argues that the acts prior to October 27, 2007 are timely because her EEOC charge contains allegations beginning in 2004, the EEOC issued a right to sue letter on this charge, and she filed her lawsuit within ninety days of receiving same. (Dkt. No. 188-4 at 36-37.) While Plaintiff is correct that the right to sue letter from the EEOC does not explicitly reject her charge due to untimeliness, this does not mean that the acts prior to October 27, 2007 are timely.[3] The

EEOC's timeliness determination is merely a factor for the Court to weigh, "courts have generally made an independent review of the timeliness of the agency filing." *Goldman v. Sears, Roebuck & Co.*, 607 F.2d 1014, 1017 (1st Cir. 1979), *cert. denied*, 445 U.S. 929 (1980); *see also Thompson v. Bd. of Educ. of City of N.Y.*, Nos. 87 Civ. 0905, 87 Civ. 1972, 1988 WL 34811, at *1 (S.D.N.Y. Apr. 4, 1988) ("A federal court may determine if the EEOC charge was timely filed"); *Thompson v. United Fed'n of Teachers*, Nos. 87 Civ. 0077, 87 Civ. 0904, 87 Civ. 0906, 1987 WL 28807, at *4 (S.D.N.Y. Dec. 16, 1987) (same). It is, therefore, for the Court to determine whether Plaintiff's claims are, as a matter of law, timely and within the statute of limitations. This requires the Court to determine whether the incidents of employment discrimination are discrete acts. As stated above, all of the incidents of employment discrimination that Plaintiff complains of are discrete acts, such that all acts prior to October 27, 2007 are untimely.

Plaintiff argues that claims prior to October 27, 2007 should be equitably tolled because Defendants actively concealed the violation. (Dkt. No. 190 at 6.) Specifically, Plaintiff argues that she "did not know that Defendants would use the alleged 2-year transfer policy to justify her denial in 2005, until she received the EEOC decision in 2011." (*Id.*) Defendants point the Court to various correspondence between Defendants and Plaintiff prior to August 22, 2008 where the two-year transfer expectation was discussed. (Dkt. Nos. 176-16, 176-19, 188-11.)

---

[3] On April 4, 2011 the EEOC issued Plaintiff a right to sue letter with the following determination: "[T]he EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge." (Dkt. No. 176-38 ("Right to Sue Letter").) Additionally, on March 31, 2011, EEOC investigator George Marinucci wrote a letter to Plaintiff explaining the EEOC's determination. (Dkt. No. 181-10.) In that letter he informed Plaintiff that her "charge raises a number of issues some of which are

---

untimely (religious accommodation request, certain evaluations, request for a raise, certain transfer requests)." (*Id.*)

Equitable tolling is "only appropriate in rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising [her] rights." *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (alteration omitted) (citation omitted). The Supreme Court has "allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 96 (1990). Equitable tolling has also been applied where the defendant's affirmative misconduct may have lulled plaintiff to inaction. *See Villasenor v. Lockheed Aircraft Corp.*, 640 F.2d 207, 207-08 (9th Cir. 1981) (*per curiam*).

> When determining whether equitable tolling is applicable, a district court must consider whether the person seeking application of the equitable tolling doctrine (1) has 'acted with reasonable diligence during the time period she seeks to have tolled,' and (2) has proved that the circumstances are so extraordinary that the doctrine should apply.

*Zerilli-Edelglass*, 333 F.3d at 80-81 (quoting *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002)). "The burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff." *Boos v. Runyon*, 201 F.3d 178, 184-85 (2d Cir. 2000).

Plaintiff fails to direct the Court's attention to any evidence in the record that she was prevented in some extraordinary way from exercising her rights. She fails to present evidence in the record that Defendants "actively concealed the violation." In fact, the record includes a series of emails that include allusions, if not explicit references, to the two-year policy. For example, Smith replied to an email by Plaintiff on March 1, 2005 that stated "We normally expect you to stay in your division for two years. If you want to get out earlier (in fact, whenever you want out) you need your division's approval." (Dkt. No. 188-11 at 2.) Further, in an email exchange between Plaintiff and Goode-Trufant, dated January 30, 2006, Goode-Trufant referenced a "transfer period." (Dkt. No. 176-16 ("I met with Fay Leoussis concerning your desire to be released from Tort prior to the transfer period.") Furthermore, in an email dated March 22, 2006, from Foster G. Mills ("Mills") to Plaintiff, Mills informed Plaintiff:

> You are eligible to apply for a transfer under this procedure if you will have two year's service with the Law Department as of September, 2006. . . . All transfers are subject to the agreement of the affected division chiefs, the existence of vacancies in the requested division and the general need of the Department.

(Dkt. No. 176-18.)

Even further, Defendants' Office Manual dated August 2007 sets forth an "Attorney Transfer Policy," which states, in relevant part, "In general, attorneys are eligible for transfer to another division after serving two years in their current division. While transfers prior to two years are discouraged, the department does consider exceptional circumstances that might warrant transfer at an earlier time." (Dkt. No. 176-6 at 19.)

By the evidence before the Court, Plaintiff knew or, if she acted with reasonable diligence, could have known that the two-year policy was the purported basis for the rejection of her transfer requests. Plaintiff has pointed to no misstatements, misconduct, or concealment of the policy on the part of Defendants, nor has she described any particular action that could be characterized as a deliberate obscuring of the policy. As she has failed to show any particular—much less extraordinary—circumstance that led to her delayed filing of her claims, equitable tolling is not warranted in this case. *See Rock v. Mustich*, No. 08-CV-4976 (CS) (PED), 2009 WL 2391776, at *3 (S.D.N.Y. Aug. 3, 2009) (denying equitable tolling claim where plaintiff was unable to point to any representation that misled her). Plaintiff's failure to act diligently is not a reason to invoke equitable tolling. *See Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984) (*per curiam*). Accordingly, equitable tolling is not available to Plaintiff, therefore, I respectfully recommend that summary judgment be granted in favor of Defendants for all acts that Plaintiff claims violated Title VII prior to October 27, 2007 as they are untimely.[4]

---

[4] Because the statute of limitations is not a rule of evidence this conclusion would, by no means, preclude Plaintiff from using events prior to this date as relevant background information for her remaining claims. *See Morgan*, 536 U.S. at 102; *see also Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001) ("A statute of limitations does not operate to bar the introduction of evidence that predates the commencement of the limitations period but that is relevant to events during the period.").

## III. Title VII

Employment discrimination and retaliation claims under Title VII are governed by the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-805 (1973). *See also Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("Federal and state law retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas* . . . ."). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of proving a *prima facie* case of discrimination. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Once a *prima facie* case has been proven, the burden of production, but not persuasion, shifts to the defendants to articulate "some legitimate, nondiscriminatory reason" for their adverse employment decision. *Id.*, 450 U.S. at 253. Even though the defendants' burden is to produce evidence of their nondiscriminatory reasons, such evidence is not subject to attack by way of a "credibility assessment." *St. Mary's Honor Ctr.*, 509 U.S. at 509; *see also Burdine*, 450 U.S. at 254 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons."). If the defendants satisfy their burden of production, the "presumption" of employment discrimination created by the plaintiff's *prima facie* case is rebutted. *Burdine*, 450 U.S. at 253, 255-56; *see also St. Mary's Honor Ctr.*, 509 U.S. at 506-507 (describing the "presumption" as a "conclusion [of employment discrimination] in the absence of explanation," which defendants' "explanation" rebuts). At the third step of the *McDonnell Douglas* analysis, the plaintiff must prove that the defendants' nondiscriminatory reasons were mere "pretext

for discrimination." *Burdine*, 450 U.S. at 253, 256.

Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff's timely claims only concern transfer requests from October 27, 2007 onward.

> To establish a claim of racial . . . discrimination under Title VII, a claimant must show that: 1) [s]he belonged to a protected class; 2) [s]he was qualified for the position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.

*Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (citing *Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002)). For the purposes of the motion, Defendants do not dispute the first two prongs, but rather argue that Plaintiff cannot satisfy the third and fourth prongs. (Dkt. No. 175 at 16.)

There is only one timely potential adverse employment between October 27, 2007 and the end of Plaintiff's employment, November 16, 2007, namely Plaintiff's transfer request to be moved to another division. (Dkt. Nos. 176-30, 190-11.) Plaintiff worked with Defendants to identify five possible divisions to which she could potentially transfer, interviews were scheduled and conducted in October and November 2007. (Dkt. No. 176-30; Dkt. No. 176-2 ("Pressley Depo.") Tr. 665:21-25.) Plaintiff was never told that this transfer request was denied. (Pressley Depo.

Tr. 650:12-24.) Instead, Plaintiff resigned her position before she received a final decision regarding this transfer request. (*Id.*)

"Courts have recognized that, if the alleged adverse employment action is created by plaintiff's own conduct, then the requirement of an adverse employment action is not satisfied." *Adams v. Yale-New Haven Hosp.*, No. 3:06CV1166 (HBF), 2012 WL 4443992, at *7 (D. Conn. Sept. 25, 2012) (*citing Mullins v. Potter*, No. 04-72965, 2005 WL 2396997, at *4 (E.D. Mich. Sept. 28, 2005); *Garrett v. Bd. of Trustees of Univ. of Ala.*, 354 F. Supp. 2d 1244, 1248 (N.D. Ala. 2005), *aff'd*, 507 F.3d 1306 (2007)). Plaintiff's exit from the Law Department effectively denied her any possibility of a transfer to these five divisions. Plaintiff left before Defendants could grant or deny her transfer request—an act that potentially could have been an adverse employment action. Plaintiff cannot request a transfer, leave before such a request is acted on by Defendants, and then claim it as an adverse employment action. Defendants have not, by definition, taken action, but rather were in the process of determining what action to take. *See Mullins*, 2005 WL 2396997, at *3 (finding no adverse employment action where defendant issued removal notice, but withdrew it before effective; *see also Garrett*, 354 F. Supp. 2d at 1248 ("Garrett cannot be justified in not accepting a never effectuated, if suggested, transfer with no reduction in pay, and describing it as an 'adverse employment action.'") At the time of Plaintiff's exit she did not know, and would never know, whether Defendants would have granted or rejected her transfer request, such that it cannot amount to an adverse employment action.

Any argument that Plaintiff's decision to leave the Law Department amounts to a constructive discharge must also be rejected. A constructive discharge is "functionally the same as an actual termination" and therefore is considered an adverse employment action. *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004); *see also Fitzgerald*, 251 F.3d at 357 ("Adverse employment actions include discharge from employment. Such a discharge may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge.").

The standard for constructive discharge is whether "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Suders*, 542 U.S. at 141. "Constructive discharge occurs when an employer *deliberately* makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Kader v. Paper Software, Inc.*, 111 F.3d 337, 339 (2d Cir. 1997) (emphasis in original). A constructive discharge occurs when an employer "intentionally create[s] an intolerable work atmosphere that force[s the plaintiff] to quit involuntarily." *Andersen v. Rochester City Sch. Dist.*, 481 Fed. App'x 628, 632 (2d Cir. 2012) (quoting *Serricchio v. Wachovia Secs. LLC*, 658 F.3d 169, 185 (2d Cir. 2011)), *cert. denied*, 133 S. Ct. 836 (2013). "To find that an employee's resignation amounted to a constructive discharge, 'the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000) (quoting *Lopez v. S.B. Thomas*, 831 F.2d 1184, 1188 (2d Cir. 1987)). Plaintiff's exit from the Law

Department fails to rise to the level of an adverse employment action for the reasons explained below.

"An employee who remains on the job while looking for alternative employment is hard-pressed to establish that her working conditions were intolerable." *Regis v. Metropolitan Jewish Geriatric Ctr.*, 97-CV-906 (ILG), 2000 WL 264336, at *12 (E.D.N.Y. Jan. 11, 2000) (citing *Wagner v. Sanders Assocs. Inc.*, 638 F. Supp. 742, 745-46 (C.D. Ca. 1996)). By Plaintiff's own testimony she admits that she remained at the Law Department while looking for employment beginning in 2007. (Pressley Depo. Tr. 774:8-13, 20-22.) She testified that she began looking for other employment "because [she] saw that [her] career was over there," meaning the Law Department. (*Id*. Tr. 774:11-13.)

Plaintiff applied to Malapero & Prisco on October 15, 2007, was offered the position on November 2, 2007, before she left the Law Department, and started with the firm on December 10, 2007. (*Id*. Tr. 773:16-22; Dkt. No. 176-35 at 6.) Plaintiff looked for alternative employment for months before resigning at the Law Department, which undercuts her claim that her employment was so intolerable so as to constitute a constructive discharge. *Regis*, 2000 WL 264336, at *12 (citing *Kripke v. Benedictine Hosp.*, 169 Misc. 2d 98, 641 N.Y.S.2d 996, 1001 (Sup. Ct. 1996), *aff'd*, 255 A.D.2d 725, 680 N.Y.S.2d 687 (3d Dep't 1998)). Plaintiff's own testimony cites her belief that her career was over at the Law Department as the impetus for searching for other employment, not an intolerable condition. (Pressley Depo. Tr. 774:11-13.) Plaintiff submitted her resignation to Goode-Trufant on November 7,

2007, *after* she secured a position at Malapero & Prisco. (Dkt. No. 176-32.)

Further, Plaintiff's testimony describes her situation at the Law Department after *2005* as "impossible–intolerable." (Pressley Depo. Tr. 774:19-21.) Although Plaintiff was dissatisfied with her evaluations, criticism of her work, supervisors, etc., the record does not reflect working conditions so difficult or unpleasant as to permit an inference that a reasonable person in Plaintiff's position would believe she was forced to resign. "Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993). The record does not show a change in Plaintiff's working conditions in 2007. In fact, Plaintiff's own testimony describes the whole period from 2005 to 2007 as "impossible–intolerable." This could not cause a reasonable person in her position to conclude that she was forced to resign in November 2007. *See id*. at 361 (finding no rational trier of fact could find that plaintiff was constructively discharged where plaintiff's working conditions were consistent from 1987 until plaintiff's 1990 resignation and refusing to find that plaintiff's contention that denial to find plaintiff new job within NYNEX was constructive discharge).

Furthermore, Plaintiff's testimony undercuts her claim that the conditions were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee*, 223 F.3d at 73. Plaintiff testified that she "would not have resigned if—I would not have left if I could get a transfer . . . ." (Pressley Depo. Tr. 650:17-19.) Plaintiff asked Goode-Trufant on Plaintiff's last night at the Law Department to let her know if she received a transfer after

she left because "if she would—were to tell me, I would come back . . . ." (*Id*. Tr. 650:22-23.) In Plaintiff's resignation letter to Goode-Trufant she stated that she was "amenable to discussing a more fair and equitable resolution than what was offered . . . ." (Dkt. No. 176-32.) Additionally, Plaintiff turned down the original offer made to her on October 16, 2007 to immediately transfer to another Tort unit and instead elected to stay and pursue a transfer to another Law Department division. (Dkt. No. 176-30; *see also* Dkt. No. 188-32 at 2 (directing Plaintiff "should be permitted to transfer to another unit of the Tort Division at the earliest possible opportunity. Additionally, if there is an opportunity, given [Plaintiff's] skills and experience, for [her] to transfer to another Law Department Division, such a transfer will be encouraged.") Plaintiff's willingness to stay within SLU when offered an immediate transfer out, willingness to stay in the Law Department if her requests were met, and/or willingness to return if she received a transfer does not indicate that a reasonable person in Plaintiff's shoes would find the conditions so intolerable and unpleasant and feel compelled to resign. *See Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 312 (S.D.N.Y. 2009)(finding no constructive discharge where "plaintiff admits that she would have stayed at her job if a better opportunity had not arisen.").

Even further, Plaintiff left the Law Department in the midst of Defendants processing her transfer request. Specifically, she applied to Malapero & Prisco on October 15, 2007, even before she received Defendants' EEO determination on October 16, 2007. (Dkt. No. 176-35 at 6; Dkt. No. 188-32.) Plaintiff interviewed with five divisions for potential transfers and had not heard back from them by the time she resigned. "[C]ourts in this circuit generally

have refused to find a constructive discharge where an employee had an avenue through which [s]he could seek redress for the allegedly 'intolerable' work atmosphere leading up to h[er] resignation, but failed to take advantage thereof." *Silverman v. City of N.Y.*, 216 F. Supp. 2d 108, 115 (E.D.N.Y. 2002) ("[T]he fact that [plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation."); *see also Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156-57 (2d Cir. 1993) (finding that plaintiff claiming defendants deliberately attempted to make him ill in order to force him to resign failed to establish constructive discharge because, *inter alia*, he could have lodged complaint with human resources about behavior); *Weisbecker v. Sayville Union Free Sch. Dist.*, 890 F. Supp. 2d 215, 235-36 (E.D.N.Y. 2012) (holding supervisor's recommendation that plaintiff be terminated was not constructive discharge because, among other things, plaintiff had the "ability to request reasons for the recommendation from [the supervisor] and submit a response").

Here, Plaintiff had an avenue through which she could seek redress and was in the process of ascertaining whether she would be able to get the relief sought when she resigned. Unlike the cases cited above, Plaintiff did partially participate in an avenue to seek redress, however she did not see it to its conclusion and it is impossible for Plaintiff or the Court to know whether this process would have remedied the situation. Plaintiff, in her expression of willingness to come back to the Law Department if a transfer was approved, evinces that such a transfer would have remedied what she calls an "impossible–intolerable" situation. No

constructive discharge can be found because it is impossible to know whether the transfer would have remedied the problem. *See Stembridge v. City of N.Y.*, 88 F. Supp. 2d 27, 284-86 (S.D.N.Y. 2002) (finding no constructive discharge where "plaintiff had the opportunity to present his side of the story in the scheduled disciplinary hearing," because "[i]t is impossible to know whether the hearing could have actually remedied the situation or address the . . . misconduct because plaintiff chose not to participate in the process"); *see also Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 507 (S.D.N.Y. 2013) (granting defendants' motion for summary judgment and holding "[p]laintiff tendered her resignation before [reassignment] could be put in place and, therefore, cannot claim constructive discharge").

Plaintiff makes a series of short arguments not directed at a specific element or prong, but generally directed to her overall claim. (Dkt. No. 190 at 11-13.) Plaintiff's reliance on evidence of these time-barred claims to prove Defendants' "affirmative evidence of guilt," dishonesty, or untrustworthiness is misplaced. These arguments fail to address *Plaintiff's* deficiencies related to her burden under *McDonnell Douglas* to establish a *prima facie* case of employment discrimination.

For the reasons stated above, Plaintiff's resignation from the Law Department cannot amount to a constructive discharge. Plaintiff has not suffered a timely adverse employment action nor constructive discharge. Her additional arguments related to her Title VII claim are unavailing. Therefore, I respectfully

recommend that Defendants' motion for summary judgment as to this claim be granted.[5]

## IV. Retaliation

Title VII prohibits "an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *See* 42 U.S.C. § 2000e-3(a); *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988). Retaliation claims are evaluated under the same *McDonnell Douglas* burden-shifting framework as discrimination claims. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

> In order to make out a *prima facie* case of retaliation, a plaintiff must show by a preponderance of the evidence i) participation in a protected activity known to the defendant; ii) an employment action disadvantaging the plaintiff; and iii) a causal connection between the protected activity and the adverse employment action.

*Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir. 1995) (citing *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 64 (2d Cir. 1992)). A plaintiff's burden is *de minimis*; the court must "determine only whether proffered

---

[5]     Plaintiff makes the additional argument that "all of [D]efendants' defenses are pretextual." (Dkt. No. 190 at 13.) As Plaintiff has failed to make a *prima facie* case under Title VII, the issue of pretext is not reached. This argument will be considered with regards to Plaintiff's retaliation claim as explained below.

admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).

### A. *Prima Facie*

Defendants argue that Plaintiff cannot establish a *prima facie* case of retaliation because she has not established that she suffered a materially adverse employment action or a causal connection between the protected activity and the adverse employment action. (Dkt. Nos. 175 at 16-22; 178 at 22-28.) I agree.

I turn first to the issue of whether Plaintiff suffered a materially adverse employment action. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). In light of the timeliness issue for Plaintiff's Title VII claim, as discussed above, the only timely materially adverse employment actions must have occurred on or after October 27, 2007. Those potential actions can be divided into three events: (1) Plaintiff's transfer request and related interviews; (2) Plaintiff's resignation; and (3) Plaintiff's subsequent termination from Malapero & Prisco.

Plaintiff's transfer request and related interviews happened after October 27, 2007. As discussed above, however, because Plaintiff exited the Law Department before Defendants made a determination regarding her transfer request, there is nothing that could

yet amount to a materially adverse employment action. As I said above, there was not yet an action, such that it could not be deemed materially adverse or not. Because the standard for a materially adverse employment action in the retaliation context is broader than in the discrimination context, however, I will analyze the related interviews conducted with respect to this request to the extent that Plaintiff alleges that she experienced retaliation therein.

In connection with Plaintiff's request to be transferred out of the Tort Division, she interviewed with five divisions: Tax and Bankruptcy, Administrative Law, Affirmative Litigation, Commercial and Real Estate Litigation, and Labor and Employment Law. (Pressley Depo. Tr. 665:23-25; 688:11-15.) Plaintiff complains that she experienced retaliation in connection with these interviews because: (1) her interviewers were not warm to her; (2) they knew of her EEO issues; (3) she was asked non-routine questions that reflected this knowledge; and (4) she was refused transfers by her interviewers.

With regards to the interviewer's attitudes toward Plaintiff, she testified at her deposition that "some interviewers . . . weren't warm which appeared as if they were just doing it because they were forced." (*Id*. Tr. 648:20-22.) She specifically testified that the deputy chief of the Administrative Law division's facial expression did not receive Plaintiff mentioning that a federal judge spoke favorably about her work well. (*Id*. Tr. 648:23-25; 649:2-6.) "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. Plaintiff has failed to

show that such attitudes rose above petty slights, such that the interviewers' attitudes towards her fails to rise to the level of a materially adverse employment action.

Plaintiff also alleges that based on the questions she was asked and the statements made by her interviewers, they knew she was an EEO complainant. (Pressley Depo. Tr. 647:18-25; 648:1-4.) Specifically, Plaintiff stated that the chief of the Administrative Law division told her that the division does "a lot of criminal work" and from that statement Plaintiff averred that the chief "not only knew [she] was an EEO complainant but that they knew specifically some of the issues that [she] discussed with [Goode-Trufant] . . . ." (*Id*. Tr. 649:12; 650:8-11.) While Defendants' knowledge of Plaintiff's protected activity is part of the *prima facie* case of retaliation, it is also not disputed by Defendants in this motion, such that this allegation also fails to rise to the level of a materially adverse employment action.

Next, Plaintiff alleges that during her interviews she was asked questions that reflected the interviewers' knowledge of her engaging in protected activity. Specifically, Plaintiff testified that "[she] was asked at a couple of interviews to tell them what the division did which, of course, it's usually the other way around . . . ." (*Id*. Tr. 648:5-7.) Plaintiff averred that these questions were "because [the division chiefs] wanted to make sure that [she] was really interested in coming there and not, you know, coming for apparently other reasons." (*Id*. Tr. 648:13-15.) When Plaintiff interviewed with Rundabaken for the Commercial Litigation division, he said that she would have to agree to a two year commitment. (*Id*. Tr. 739:12-19; 740:3-4.) Also, when Plaintiff was interviewed by Gail Rubin for the Affirmative

Litigation division, she asked Plaintiff to describe specifically what her division did and wanted to make sure that the person who was coming to her division wanted to come because of an interest in the division. (*Id.* Tr. 743:17-22.) To Plaintiff, these questions "showed and served to discourage my advancing, to discourage to find a basis, a reason not to grant the transfer which is consistent with the discriminatory/retaliatory practice and policy that has been instituted against me and you know, in —blacks in general . . . ." (*Id*. Tr. 740:17-22.)

It is well established that a plaintiff cannot defeat a motion for summary judgment "on the basis of conjecture or surmise." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). While Plaintiff argues that interviews are usually conducted with the interviewer telling the interviewee about the job, she fails to direct the Court to any evidence in support of that statement beyond her own belief. Further, Plaintiff fails to show how she was prejudiced by the asking of such questions. Though she *speculates* that the motivation behind these questions was to discourage her advancement and find a basis upon which to deny her transfer, this is unsupported conjecture. In fact, as has been discussed above, Plaintiff was not rejected by any of the five divisions for a transfer prior to her departure from the Law Department, such that she cannot claim that these questions were asked so as to facilitate the denial of her transfer. Plaintiff has not shown that these questions rise above "petty slights, minor annoyances, and simple lack of good manners . . . ." so as a reasonable worker would have been dissuaded from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68-69. Accordingly, the interviewers' questions,

which may have reflected their knowledge of Plaintiff's EEO history, are not materially adverse employment actions.

Plaintiff also asserts that she suffered materially adverse employment actions in the form of denials of transfers by her interviewers. (Pressley Depo. Tr. 688:21-25; 692:9-12; 741:24-25; 742:2-3; 743:17-22.) Plaintiff, however, was never told that any of these five transfer requests were denied and instead resigned before receiving a final decision. (*Id.* Tr. 650:12-24.) Plaintiff fails to show that the interviewers had to offer her a position on the spot or it would otherwise be deemed a rejection. Because Plaintiff was never denied any of these transfers, they cannot serve as materially adverse employment actions.

Plaintiff also argues that her constructive discharge was the result of retaliation. However, as discussed above, Plaintiff's resignation from the Law Department cannot amount to a constructive discharge. Thus, Plaintiff's resignation cannot serve as a materially adverse employment action.

Finally, Plaintiff alleges that her subsequent termination from Malapero & Prisco was the result of retaliation and, therefore, was a materially adverse employment action. The Supreme Court has explicitly held that a claim of retaliation based on conduct occurring after termination of the employer-employee relationship is actionable. *See Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). Plaintiff's termination from Malaperio & Prisco could, therefore, constitute as a materially adverse employment action. However, Plaintiff cannot establish a causal connection between any protected activity and her termination from Malaperio & Prisco.

Plaintiff has not offered any evidence of a direct casual relationship between protected activity and her termination from Malaperio & Prisco. Plaintiff offered no direct evidence that her Malaperio & Prisco supervisors ever became aware of her EEO complaint lodged with Defendants or state court complaint, rather she speculates that her supervisors gained knowledge regarding these activities when she appeared at the Bronx Torts Unit's office for a deposition in May while working for Malaperio & Prisco.[6] (Dkt. No. 188-1 ¶ 52.) Plaintiff's affidavit states that when she returned from the deposition her "supervisors there looked strangely at me . . . ." and noted that "[a]lso around this time [Defendants] answered [her] state court complaint." (*Id.* ¶ 53.) Andrew L. Klauber ("Klauber"), Plaintiff's handling partner at Malaperio & Prisco, testified at his deposition that no Defendants contacted him about Plaintiff during her employment at Malaperio & Prisco. (Dkt. No. 176-34 ("Klauber Depo.") Tr. 12: 3-6; 16: 9-10.)

Where there is no direct evidence of a causal relationship, a plaintiff may still show a causal link "by demonstrating that there was a short time lapse between the protected activity and the alleged retaliation." *Fairs v. Instructional Sys., Inc.*, 259 F. 3d 91, 99 (2d Cir. 2001) (citing *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)). The Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation," it has held a causal relationship existed where as many as five months has lapsed between the protected activity and an employee's termination. *Gorzynski*, 596 F.3d at 110. That said, claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing with approval cases dismissing retaliation claims where adverse employment action followed protected activity by three to four months); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80 (2d Cir. 1990) (finding lack of evidence that adverse action, taken three months after EEOC complaint, was in response to plaintiff's protected activity).

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Bryant v. Verizon Commc'ns Inc.*, 550 F. Supp. 2d 513, 537 (S.D.N.Y. 2008) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)). Prior to Plaintiff's termination at Malaperio & Prisco in June 2008, she engaged in two protected activities. The first, Plaintiff's filing of the EEO complaint with Defendants on May 18, 2007. (Dkt. No. 176-28.) Plaintiff's alleged materially adverse employment action happened over one year prior to this protected activity. The second, although unsupported in the record, is Plaintiff's state court complaint, which, according to Plaintiff's memorandum of law in support of her cross-motion, was filed in January 2008. (Dkt. No. 188-4 at 9.) Despite this memorandum of law not being admissible evidence, it is the only mention of a specific date associated with Plaintiff's state law court complaint, such that for the sake of

---

[6] It should be noted that Plaintiff's affidavit claims that this deposition occurred in May 2007, however, Plaintiff did not begin working for Malaperio & Prisco until December 7, 2007, such that I believe this is a typographical error and this actually occurred in May 2008.

completeness I will use the date contained therein for this analysis. The second protected activity, therefore, occurred six months prior to the alleged materially adverse employment action.[7]

Where, as here, when approximately one year elapsed between the protected activity and the adverse employment action, the Second Circuit has upheld the District Court finding the lack of a causal relationship via temporal proximity. *See Butler v. Raytel Med. Corp.*, 150 Fed App'x 44, 47 (2d Cir. 2005). Additionally, Plaintiff has not established sufficient temporal proximity to support an inference of a causal nexus between her filing of the state court complaint in January 2008 against Defendants and her termination with Malaperio & Prisco. *See Wojcik v. Brandiss*, 973 F. Supp. 2d 195 (E.D.N.Y. 2013) (span of nearly six months between employee's complaints and incident that led to termination precluded temporal proximity sufficient to support retaliation claim). Because Plaintiff cannot establish causation in satisfaction of the fourth prong of a *prima facie* case of

retaliation her claim cannot survive Defendants' motion for summary judgment.

### B. Pretext

Even assuming that Plaintiff could establish a *prima facie* case of retaliation, the burden then shifts to Defendants to set forth a legitimate, nonretaliatory reason for the materially adverse employment action. Defendants present the deposition testimony of Klauber that states that the decision to fire Plaintiff was "wholly and solely" his own. (Klauber Depo. Tr. 13:2-12.) He further testified that the City of New York did not have anything to do with Plaintiff's termination. (*Id.* Tr. 24:18-21.) Specifically, Klauber testified that his issues with Plaintiff's job performance were related to her work, specifically the handling and reporting of files. (*Id.* Tr. 17:4-23.) He described that Plaintiff's employment at Malaperio & Prisco "wasn't a situation that was working out for me and for the firm ultimately . . . it was a performance issue basically." (*Id.* Tr. 17:24-25; 18:2-4.)

### C. Causation

Having satisfied their burden that there was a legitimate, nondiscriminatory reason for Plaintiff's termination from Malaperio & Prisco, the presumption of retaliation is rebutted and "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 2010-11 (1993) (citation omitted). The burden shifts back to Plaintiff to show, without the benefit of any presumption, that a reasonable jury could conclude by a preponderance of the evidence that the employer's explanation is merely a pretext for impermissible retaliation. *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002). The Supreme Court has held in *Univ. of Tex.*

---

[7] It should be noted that Plaintiff alleges in her affidavit that Defendants answered the state court complaint in May 2008. (Dkt. No. 188-1 ¶ 53 ("Also around this time the City answered my state court complaint.").) However, "[i]n a causation analysis, the Court must look to when the defendant first became aware of the plaintiff's protected behavior." *Hawana v. City of N.Y.*, 230 F. Supp. 2d 518, 530 (S.D.N.Y. 2002) (citing *Clark Cnty. Sch. Dist.*, 532 U.S. at 273). The record does not provide when Defendants were made aware of Plaintiff's protected behavior, but presumably it would have been prior to their answering the complaint.

*Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013) that for a Title VII retaliation claim a plaintiff must establish that the unlawful retaliation was a "but-for" cause of the adverse employment action, not just a substantial or motivating factor.

"[T]emporal proximity [between the protected activity and that adverse action] alone may be sufficient at the prima facie stage, [but] it is not sufficient at the pretext stage." *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 195 n.5 (E.D.N.Y. 2013).

> The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext. Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact.

*El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (citations omitted). Even assuming that Plaintiff sufficiently alleged causation via temporal proximity for the purpose of establishing her *prima facie* case, she has failed to direct the Court to any evidence of pretext in the record. Plaintiff supplies her affidavit that details phone calls that she received from Defendants' employees while she was working at Malaperio & Prisco. (Dkt. No. 188-1 ¶ 49.) Her affidavit also claims that her Malaperio & Prisco supervisors had concerns with upsetting Defendants in connection with Plaintiff's handling of cases at the firm. (*Id.* ¶ 50.) However, Plaintiff's affidavit does not contain any admissible evidence regarding a causal

link between her protected conduct and her termination at Malaperio & Prisco. Plaintiff has, therefore, failed to raise a triable issue of fact with regards to her claim for retaliation. I, therefore, respectfully recommend that Defendant's motion for summary judgment be granted as to her retaliation claim.

## IV.  Section 1983

To maintain a § 1983 action, a plaintiff must allege both that the conduct complained of was "committed by a person acting under color of state law" and "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). A plaintiff cannot base a defendant's liability on *respondeat superior* or on "linkage in the . . . chain of command." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

Plaintiff maintains § 1983 claims against the City of New York, Cardozo, and Majerus alleging that they violated her right to privacy by opening and/or seizing her sealed mail. Specifically Plaintiff alleges that the City of New York, Cardozo, and Majerus violated her right to privacy by opening and/or seizing her mail. She claims that Majerus and Cardozo, who collaborate on the "policies for the mailroom," "have established, implemented, sanctioned, accepted or caused the deliberate practice at the City of retaining, opening, and reviewing mail sent to Plaintiff and Plaintiff's business" in retaliation for her complaints and in violation of her Fourth Amendment rights. (Dkt. No. 21 ¶¶ 76, 77).

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "[C]ourts ordinarily recognize a legitimate expectation of privacy in letters and other sealed packages" under the Fourth Amendment. *United States v. Soto-Teran*, 44 F. Supp. 2d 185, 192 (E.D.N.Y. 1996); *see United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy."); *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992) (both "senders and addressees" have reasonable expectation of privacy in packages)).

A. Cardozo and Majerus

Turning first to Plaintiff's claims against the individuals, Cardozo and Majerus. A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways.

The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

*Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (citations omitted).

There is no evidence in the record, nor does Plaintiff direct the Court to any, showing that Majerus and Cardozo directly participated in opening Plaintiff's mail. In fact, Plaintiff does not seem to argue this in her papers, instead focusing on the existence and implementation of a policy by Majerus and/or Cardozo. Majerus and Cardozo may, therefore, only be held responsible due to their supervisory position in one of three ways as listed above.

First Majerus and Cardozo may be held responsible in their supervisory position if, after learning of the violation through a report or appeal, they failed to remedy the wrong. Assuming that opening Plaintiff's mail was a violation, Plaintiff must prove that Majerus and Cardozo failed to remedy the wrong after learning of it. It is undisputed that on August 3, 2010, Plaintiff sent Majerus a letter complaining that the Law Department was opening and processing her mail and requesting that the Law Department "ceas[e] the opening or processing . . . of any mail sent to my office or me."[8] (Dkt. No. 188-8 ("Majerus Letter").) Plaintiff's memorandum of law states that her "mail continued after these complaints to be opened and handled by the City of New York." (Dkt. No. 188-4 at 15.) As addressed above, this statement, which contains no citation to admissible evidence is also, in and of itself, inadmissble because it is just a statement contained in Plaintiff's memorandum of law.

_____

[8] It should be noted that the letter was addressed to "Tim Majerus," but Majerus acknowledges receiving same. (Dkt. No. 188-7 Tr. 48:7-8.)

In connection with this motion, Plaintiff produced "copies of some letters opened and searched by the [D]efendants." (Dkt. No. 188-2 ¶ 7.) Plaintiff states in her reply affidavit that by 2009 Defendants began to open, search, and seize her mail and while she "do[es] not know the total number of letters they opened, but around [six] of those, incidently, made their way to [her]." (Dkt. No. 190-2 ¶ 59.) Plaintiff, however, only produces four letters to the Court, none of which were dated after August 3, 2010. (Dkt. No. 188-9.) Plaintiff, therefore, has failed to present any evidence from which a reasonable jury could find that the alleged policy to open and review her mail, even if it did exist, continued after she complained about it. The individuals may not be held reasonable as supervisors in this way.

The second way a supervisory official may be held liable for such an alleged constitutional violation is if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. Majerus testified that Cardozo had final policy making authority. (Dkt. No. 188-7 Tr. 82:18-24.) However, he also testified that he had the ability to make policy decisions that "were not altering substantively [the] agreed upon . . . service delivery levels . . . ." (*Id.* Tr. 81:18-20.) The question then becomes whether there is a genuine issue of material fact as to the existence of the policy that Plaintiff alleges.

Majerus testified to a general policy for mail that was delivered to the Law Department that could not be attributed to a specific division. He testified that this policy was reduced to writing in 1997. (*Id.* Tr. 85:22-23.) Such mail would not be opened by a first level mailroom employee, but would go

into a bucket entitled "named." (Dkt. No. 176-5 Tr. 26:6-25, 27:2-4.) The mail in the "named" bucket would go to a second level mailroom employee who would open, staple, and clock the mail; then research the mail and try to identify where it belonged. (*Id.* Tr. 27:7-8, 11-14; *see also* Dkt. No. 176-36.) If the case could not be identified from the mail, then it would be sent to a deputy to examine. (Dkt. No. 176-5 Tr. 43:23-25.) If the right destination for the mail could not be found, then the mail was returned to the sender. (*Id.* Tr. 31:10-14.) If the mail was identified as belonging outside of the Law Department and 100 Church Street, it was put back into its envelope, generally with a letter of apology, and mailed. (*Id.* Tr. 31:20-23.) If the mail was identified as belonging to a different office within 100 Church Street, then the letter would be taken to a supervisor and the supervisor would be directed to take it down to the lobby for them to pass on. (*Id.* Tr. 32:3-6.)

When Majerus was asked whether he "implement[ed] a policy procedure or direction to open, read or retain [Plaintiff's] mail after she left the employment of the New York City Law Department?" he responded "Never." (*Id.* Tr. 93:18-22.) Majerus was asked the same question regarding whether Cardozo implemented such a policy to which Majerus also responded "No." (*Id.* Tr. 93:23-25, 94:2-4.) Majerus also responded "No" when asked whether "anyone at the Law Department ever issue[d] a procedure, policy or direction to open, read and retain [Plaintiff's] mail after she left the employment of the Law Department." (*Id.* Tr. 94:5-9.)

Plaintiff cannot point to any direct evidence in the record of the alleged policy to open and seize *her* sealed mail. While Plaintiff directs the Court's attention to a

letter from AIG Insurance Company that "was, without dispute, opened, retained, reviewed, and distributed within, by the law department," she fails to show that this treatment "was clearly a selective process." (Dkt. No. 188-4 at 12-13.) This treatment seems to conform to the City's general policy and Plaintiff fails to show that the policy specifically targeted *her*. In her papers she attempts to point to circumstances from which she infers the existence of such a policy. For example, Plaintiff argues that Majerus' testimony that he did not know if "there [are] any other documents showing first level sorting that could be within the period of 2009 or 2012" (dkt. no. 188-77 tr. 88:5-7) serves as "proof that the [D]efendants have not produced all of the documents containing the names or identities of all the individuals whose mail they selectively opened during the relevant period of 2009-2012 (dkt. no. 188-4 at 11).

She also attempts to attack the edit date on one of the first level sorting policy sheets because its revised date is noted as "6/1/2012." (Dkt. Nos. 176-36; 188-4 at 12.) However, Majerus testified, and Plaintiff has not refuted, that mail with no division association and just a name would not be opened at the first level, but instead go into the "named" bucket and would then be opened by a second level mailroom employee. (Dkt. No. 176-5 Tr. 26:6-25, 27:2-4, 7-8.) Defendants have provided two documents entitled "2nd Level Sorting and 2nd Level Tasks" dated "05-04-06" and "03/31/10," respectively. (Dkt. No. 176-36.)

Plaintiff also argues that Majerus' testimony surrounding his actions after receiving Plaintiff's August 3, 2010 letter indicates that Plaintiff was the target of a policy. (Dkt. No. 188-4 at 12.) Specifically

Majerus testified that after receipt of the letter he "would have discussed that letter with Jerry and asked him to please remind all of his staff to pay attention to follow the procedures, and to watch for mail now, since [Plaintiff] had brought that forward as an issue, to watch for [her] name as best they could and not open that mail." (Dkt. No. 188-7 Tr. 48:19-25.) He further testified that prior to receiving the August 3, 2010 letter from Pressely he had no specific recollection of being familiar with her or her name. (*Id.* Tr. 48:5-16.) Furthermore, Majerus testified that after receiving the letter he

> call[ed] personnel and [said] what can you tell me on Melissa Pressley, is she still here or where is she, and they said she no longer works for us, so that's—based on that, then I asked Jerry to check with the building, and that's now I determined that you worked in the building.

(*Id.* Tr. 49:7-13.)

Plaintiff, in her memorandum of law argues that "[i]f Plaintiff had not already been in a system, on a list, or targeted in any way to have her mail open, it would have been unreasonable to conduct an investigation in the building and contact Personnel." (Dkt. No. 188-4 at 15.) Plaintiff does not cite to case law or evidence in the record to support this statement. She further argues that "he could not have known that Plaintiff was a former employee at the law department," which is bolstered, not refuted by Majerus' inquiry. (*Id.* at 14.) Majerus testified that the Law Department would "open [mail] to try and identify it, identify if the mail was ours to start with, since the post office delivered it to us." (Dkt. No. 176-5 Tr. 43:11-14.) He testified that because of the turnover at the

Law Department it was common to get mail containing legal documents addressed to a name at 100 Church Street, but that the "names don't always mean that that same person is still assigned to this case, so if somebody leaves, cases get reassigned . . . ." (*Id.* Tr. 50:7-12, 54:4-6.) Finally, Plaintiff alludes, but does not directly argue in her papers, that because Majerus did not know of any one else who made a formal complaint regarding the opening of their mail during the same period that the policy was directed at her. (Dkt. No. 188-4 at 10.)

Plaintiff cannot create a genuine issue of material fact through speculation and conclusory statements. *See Nat'l Westminster Bank USA v. Ross*, 676 F. Supp. 48, 51 (S.D.N.Y. 1987); *Cushing v. Morning Pride Mfg., L.L.C.*, No. 05-CV-3612, 2008 WL 283772, at *10 (E.D.N.Y. Jan. 30, 2008). It is not enough for Plaintiff to allege the existence of a policy to specifically search and seize her mail. She, therefore, has failed to raise a genuine issue of material fact as to the existence of a policy to violate her right to privacy by opening and/or seizing her sealed mail. Despite Majerus and Cardozo being, arguably, in a position to create or continue a policy or custom, Plaintiff has failed to raise a genuine issue of material fact as to the sheer existence of such a policy or custom. Accordingly, Majerus and Cardozo, as supervisory officials, could not be held liable under the second way.

The third and final way a supervisory official may be personally liable is if he was grossly negligent in managing subordinates who caused the unlawful condition or event. "The standard of gross negligence is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (citing *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 255 (2d Cir. 2001)). "A supervisor is not grossly negligent, however, where the plaintiff fails to demonstrate that the supervisor knew or should have known of a problematic pattern of employee actions or where the supervisor took adequate remedial steps immediately upon learning of the challenged conduct." *Raspardo*, 770 F.3d at 117 (citing *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003); *Colon v. Coughlin*, 58 F.3d 865, 873(2d Cir. 1995)). "A plaintiff pursuing a theory of gross negligence must prove that a supervisor's neglect caused his subordinate to violate the plaintiff's rights in order to succeed on her claim." *Raspardo*, 770 F.3d at 117 (citing *Poe v. Leonard*, 282 F.3d. 123, 140 (2d Cir. 2002)).

With respect to Majerus, it is unclear whether Plaintiff actually argues that he could be held liable as a supervisor under this theory, however, for the sake of completeness I will address whether it is possible. As discussed above, Majerus testified that upon receipt of Plaintiff's August 3, 2010 letter regarding the alleged violative policy he discussed the letter "with Jerry and asked him to please remind all of his staff to pay attention to follow the procedures, and to watch for mail now, since [Plaintiff] had brought that forward as an issue, to watch for [her] name as best they could and not open that mail." (Dkt. No. 188-7 Tr. 48:19-25.) While Plaintiff alleges that the conduct did not stop after her letter, she fails to direct the Court to any admissible evidence in support of such a claim. Plaintiff, therefore, has failed to present any evidence from which a

reasonable jury could find that the alleged policy continued after she complained about it to Majerus and he spoke to Jerry, or that Majerus, as a supervisor, did not take adequate remedial steps upon learning of the challenged conduct. Accordingly, Majerus cannot be held to be grossly negligent as a supervisor. *See Raspardo*, 770 F.3d at 117.

Insofar as Plaintiff asserts gross negligence from Cardozo's "deliberate indifference to training and supervision [of Majerus] with respect to Fourth Amendment Issues," (dkt. no. 188-4 at 14-15) this contention is conclusory. *See Doe v. Whidden*, 557 Fed. App'x 71, 73 (2d Cir. 2014) (citing *Gorzynski*, 596 F.3d at 101). Plaintiff has not presented any evidence as to specific deficiencies in the training and supervision, but only references Cardozo's "deliberate lack of involvement . . . as final decision maker . . . ." (Dkt. No. 188-4 at 16.) *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 (2d Cir. 2004) ("It is impossible to prevail on a claim that the . . . training program was inadequate without any evidence as to . . . how better or different training could have prevented the challenged conduct . . . .").

As to Cardozo's supervisory liability for a failure to supervise, it depends on a showing that he

> knew or should have known that there was a high degree of risk that [a subordinate would commit the violative conduct], but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury.

*Poe*, 282 F.3d. at 142 (2d Cir. 2002). As discussed above, Plaintiff has not directed the Court to evidence that Majerus directly participated in opening Plaintiff's mail, such that Cardozo could not have failed to supervise where the subordinate, Majerus, did not commit the violative conduct. Even if the violative conduct is interpreted as the alleged implementation of a policy to open Plaintiff's mail, Plaintiff has failed to direct the Court to evidence in the record that such a policy existed, so as to hold Cardozo liable for failing to supervise Majerus properly. Cardozo and Majerus, therefore, cannot be held individually liable for a constitutional deprivation within the meaning of 42 U.S.C. § 1983.

B.  City of New York

Regarding Defendant City of New York, municipalities, like supervisors, cannot be liable under a theory of *respondeat superior*. *Monell v. N.Y. City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). A plaintiff seeking to hold a city liable under § 1983 must "plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007). As discussed in the analysis above Plaintiff's allegations as to the existence of a policy to specifically search and seize *her* mail consist of speculation and conclusory statements. This is not enough to raise as a genuine issue of material fact as to the existence of a policy to violate her right to privacy by opening and/or seizing her sealed mail. As Plaintiff cannot satisfy the first element for *Monell* liability, the City of New York cannot be held liable for a constitutional deprivation within the meaning of 42 U.S.C. § 1983. Accordingly, I respectfully recommend that

Defendants' motion for summary judgment as to Plaintiff's § 1983 claim with respect to the Fourth Amendment be granted.

## V. **Plaintiff's Additional Arguments**

Plaintiff's papers also include additional arguments that do not directly relate to the substance of Defendants' motion for summary judgment or her cross motion for summary judgment. These arguments relate to issues that arose during discovery, as well as the motion to dismiss opinion in this case.

### A. Challenges to the Discovery Process

Plaintiff argues that she was "denied a reasonable and fair discovery process, which was never completed, including an extension/stay of discovery after she retained a new attorney, although one had been offered to [D]efendants after they replaced their lead counsel." (Dkt. No. 190 at 13.) Plaintiff does not cite to any case law to support these arguments.

#### 1. *Request for Stay of Discovery*

With regards to Plaintiff's objection to the Court's denial of her request for an extension/stay of discovery after she retained new counsel, Plaintiff already appealed this decision to Your Honor on January 8, 2014, and Your Honor subsequently denied Plaintiff's appeal that same day. (Dkt. No. 157; Order dated 1/8/2014.) If Plaintiff wanted the decision to be reconsidered she needed to move for reconsideration or reargument "within fourteen (14) days after the entry of the Court's determination of the original motion . . . ." Local Civil Rule 6.3. Plaintiff failed to move for reconsideration in a timely manner, such that any request to

reconsider such decision should be denied as untimely.

To the extent Plaintiff argues that discovery was never completed, this argument can be construed as an application for a continuance of Defendants' motion for summary judgment pursuant to Federal Rules of Civil Procedure 56(f) so as to conduct additional discovery. However, Plaintiff has failed to make the necessary showing of what discovery is still needed and how this "additional discovery [s]he requests would raise a genuine issue of material fact related to [a] key issue in this case . . . ." *Newman v. Zenk*, No. 05-CV-759 (ARR), 2007 WL 68888112, at *7 (E.D.N.Y. Mar. 29, 2007), *aff.*, 309 Fed. App'x 535 (2d Cir. 2009) (citing *Sage Realty Corp. v. Ins. Co. of N. Am.*, 34 F.3d 124, 128 (2d Cir. 1994)).

#### 2. *Denial of Counsel at Deposition*

Plaintiff also states in her papers that she "intends to move at trial to preclude the use of her deposition, conducted by [D]efendants in the fall of last year." (Dkt. No. 188-4 at 59.) The basis upon which Plaintiff intends to move is that she "was not permitted to appear with counsel for a deposition that lasted three full days." (*Id.*) On September 10, 2013 Plaintiff requested to appear at her deposition with counsel. (Dkt. No. 132.) Such request was denied on September 12, 2013. (Order dated 09/12/2013.) On September 13, 2013 Plaintiff moved for reconsideration of the denial, which was also denied. (Dkt. No. 136; Order dated 09/13/2013.) With regards to nondispositive matters, "[a] party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections . . . ."

FED. R. CIV. P. 72(a). Plaintiff did not object to the September 13, 2013 Order denying reconsideration of my September 12, 2013 Order denying Plaintiff the ability to appear with counsel for her deposition. "[A] *pro se* litigant who fails to object timely to a magistrate's order on a non-dispositive matter waives the right to appellate review of that order." *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 605 (2d Cir. 2008). Accordingly, Plaintiff is not entitled to further review of this order.

## B. Plaintiff's Section 1983 Claim of Fourteenth Amendment Violation

Finally, to the extent that Plaintiff's § 1983 claim for a violation of her due process rights vis-à-vis the EEOC proceedings has survived, I respectfully recommend that it be dismissed. (*See* Compl. ¶ 99(d) ("Further, [Defendants] deprived Plaintiff of a fair investigative process at the EEOC with willfully false submissions, which prejudiced Plaintiff as she revealed critical evidence to her case.").) Plaintiff appears to argue that this claim has survived both Defendants' motion to dismiss and the instant motion for summary judgment. (Dkt. No. 190 at 13.)

On January 14, 2013 Judge Townes ruled that "[a]s to Plaintiff's due process claim, the Court has already dismissed that cause of action in its entirety because it aries from the EEOC investigation, which took place outside the limitations period." *Pressley*, 2013 WL 145747, at *11. In addition, Judge Townes concluded that "Plaintiff's only surviving claims include: 1. the First and Second Counts, pursuant to Title VII, (which were not included in this motion to dismiss), against the City; and 2. the Sixth Count, pursuant to § 1983 under the Fourth Amendment, against the City, Cardozo, and Majerus." *Id.* at *16.

Defendants note correctly, however, that "if [Plaintiff's ¶ 99(d)] is referring to submissions Defendants made to the EEOC, and the Court has ruled that this allegation is time-barred, that ruling would be in error" (dkt. no. 96), as Defendants' submissions to the EEOC occurred within the limitations period.

Nevertheless, as noted in Defendants' original motion to dismiss, Plaintiff's second amended complaint is devoid of any allegations of Majerus' and Cardozo's personal involvement in the EEOC proceedings, such that they could be held liable for acting under color of law under § 1983.[9] (Dkt. No. 58 at 11-13.) In addition, the specific allegations regarding Majerus and Cardozo in Plaintiff's opposition papers concern her discrimination and mail opening claims, both of which the Court has found to be subject to dismissal. At this late stage it would be inappropriate to permit Plaintiff to amend the complaint yet again to make such allegations, thus, and although the issue was neither referred to me nor briefed in connection with the instant motion for summary judgment, I respectfully recommend that such claims be dismissed with prejudice.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that: Defendants' motion for summary judgment be granted and

---

[9] To the extent that paragraph 99(d) of Plaintiff's second amended complaint seeks to hold the City of New York liable under *Monell*, the claim also fails because there is no allegation, let alone evidence, of an official policy or custom to provide the EEOC with false submissions.

Plaintiff's cross motion for summary judgment be denied.

Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Pamela K. Chen within fourteen days of receipt hereof. Failure to file timely objections waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

Dated: August 27, 2015
       Brooklyn, New York

       **SO ORDERED.**

       *Ramon E. Reyes Jr.*
       Ramon E. Reyes, Jr.
       U.S. Magistrate Judge